Filed 4/25/17 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE APTOS COUNCIL, | H042976 |
| | (Santa Cruz County |
| Plaintiff and Appellant, | Super. Ct. No. CV178868) |
| v. | ORDER MODIFYING OPINION, |
| | NO CHANGE IN JUDGMENT |
| COUNTY OF SANTA CRUZ et al., | |
| Defendants and Respondents. | |

BY THE COURT:

It is ordered that the opinion filed herein on March 30, 2017, be modified as follows:

On page 18, in the first full paragraph, delete the second and third sentences entirely and the first word of the fourth sentence, so that the fourth sentence now begins:

"As argued by the County below, . . ." The first full paragraph now reads: "In its reply brief, Aptos Council argues that although CEQA mandates consideration of these cumulative impacts, the negative declarations and exemptions below do not reflect that this type of analysis occurred. As argued by the County below, the County's failure to address the purported cumulative impacts is readily explained. At the time the ordinances were considered, other regulatory reforms that may have cumulative impacts had not yet come to fruition. When future reforms are considered for environmental review, the cumulative impacts of all related reforms, as articulated in the CEQA Guidelines, will be examined."

Appellant's petition for rehearing is denied. There is no change in the judgment.

Dated:_____          _____

                                                                                       Premo, J.

_____          _____
Rushing, P.J.                                     Elia, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| APTOS COUNCIL, | H042976 |
| Plaintiff and Appellant, | (Santa Cruz County Super. Ct. No. CV178868) |
| v. | |
| COUNTY OF SANTA CRUZ et al., | |
| Defendants and Respondents. | |

Appellant Aptos Council challenges respondent County of Santa Cruz's (County) adoption of three ordinances that (1) extended minor exceptions to zoning site standards, (2) altered certain height, density, and parking requirements for hotels in commercial districts, and (3) established an administrative process for approving minor exceptions to the County's sign ordinance. Aptos Council argues the County engaged in piecemeal environmental review in violation of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] when it considered the ordinances separately. Aptos Council further insists the County failed to act in the manner prescribed by CEQA when it approved a negative declaration for the ordinance altering height, density, and parking requirements for hotels in commercial districts, because the County failed to take

___

[1] Unspecified statutory references are to the Public Resources Code. The administrative regulations implementing CEQA are set forth in the California Code of Regulations, title 14, section 15000 et seq. References to the "CEQA Guidelines" are to these administrative regulations. "In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous." (*Muzzy Ranch Co. v. Solano County Airport Land Use Comn.* (2007) 41 Cal.4th 372, 380, fn. 2.)

into consideration the environmental impacts that may ensue from future hotel developments.

For the reasons discussed below, we reject Aptos Council's claim that the County engaged in piecemeal environmental review. Although the County is in the process of modernizing some of its zoning regulations, this modernization process does not constitute a single project under CEQA. We also reject Aptos Council's claim that the negative declaration for the hotel ordinance was inadequate. The County should consider the potential environmental impacts resulting from reasonably foreseeable future development resulting from the ordinance. Future hotel developments, however, were wholly speculative at the time the negative declaration was adopted. Thus, we affirm the trial court's order denying Aptos Council's petition for a writ of mandate.

**BACKGROUND**

1. *The County's Overhaul of Zoning Regulations*

The County's planning department is in the midst of overhauling various County code sections, including code sections dealing with zoning. The planning department's Web site invites visitors to "[l]earn about new and amended land use regulations resulting from our Regulatory Reform efforts." On November 20, 2013, the County administrative officer wrote to a County supervisor providing a status update on "completed regulatory reform initiatives." The memorandum explained that "[m]odernizing, clarifying and streamlining regulations and the regulatory process is a top priority of the Planning Department, accomplished in a way that continues to respect community and environmental values." The memorandum stated the changes that had been made were "completed in order to modernize, simplify, clarify, streamline and/or provide standards where there were no clear standards previously (such as for vacation rentals)." It then provided a list of completed code amendments, a list of code amendments currently

2

scheduled for public hearings, and a list of amendments presently being worked on by the planning department.

Title 13 of the County's Code is titled "Planning and Zoning Regulations." Chapter 13.10 of title 13 is titled "Zoning Regulations."

2. *Ordinance No. 5181* (*The Minor Exceptions Ordinance*)

In 2010, the planning department proposed a series of changes to Chapter 13.10 of the County Code. The proposed changes would allow certain variances to zoning code standards be approved administratively without a public hearing. The following year, the County board of supervisors (Board) adopted Ordinance No. 5087. Ordinance No. 5087 authorized administrative approval of "minor exceptions" to zoning site standards limited to no more than a: 5 percent height increase, 15 percent setback reduction, 7.5 percent increase in the 50 percent floor-to-area ratio (FAR) for lots 4,000 square feet or less, and 15 percent increase in total allowable lot coverage. Ordinance No. 5087 restricted this authority to properties within the urban services line and certain areas shown within a map attached to the ordinance.

In March 2013, the planning department recommended extending the minor exceptions ordinance to the entire county. The County prepared Ordinance No. 5181, which extended the minor exceptions set forth under Ordinance No. 5087. Ordinance No. 5181 also extended existing provisions allowing minor exceptions and reduced garage setbacks, extended the existing provisions allowing reduction of front yard setbacks by up to 25 percent with an administrative permit, allowed a 25 percent increase in lot coverage for parcels of less than 6,000 square feet with a minor exception, and extended existing provisions allowing for up to a 50 percent reduction of side and rear setbacks for garages with a minimum 40-foot setback.

Prior to adopting Ordinance No. 5181, the Board accepted an addendum to the negative declaration prepared for Ordinance No. 5087, which found the amendments

3

would not have significant environmental impacts. Thereafter, in 2014, the Board adopted Ordinance No. 5181.

### 3. *Ordinance No. 5171* (*The Hotel Ordinance*)

In September 2013, the planning department submitted a letter to the Board recommending it schedule a public hearing to consider amendments to standards for hotel development. The letter stated the hotel standards had come to the planning department's attention as part of its "ongoing regulatory reform and economic development initiatives." In October 2013, the Board held a public hearing to consider amendments to portions of Chapter 13.10 dealing with visitor accommodations in commercial districts. The County Code had previously mandated that there be 1,100 square feet of developable area per habitable hotel room and presumed that any room over 400 square feet was composed of two or more rooms. The planning department proposed Ordinance No. 5171, which removed the one room per 1,100 square foot density limit. The ordinance also removed the existing three-story limit and reduced parking requirements from 1.1 spaces per unit to one space per unit.

Prior to the adoption of Ordinance No. 5171, the planning department circulated a negative declaration that found the amendments would not have a significant effect on the environment. In 2014, the Board adopted Ordinance No. 5171.

### 4. *Ordinance No. 5172* (*The Sign Ordinance*)

In October 2013, the Board held a public hearing to consider amendments to the County Code that would allow administrative approvals of sign exceptions with a public notice. The proposed amendments also provided for a public hearing before the zoning administrator for exceptions that exceeded certain limits. Prior to the amendments, applications for signs exceeding County regulations required a variance and a public hearing. When proposing the amendments, the planning department characterized them as "part of the ongoing Planning Department program to streamline permit review,

4

modernize the County Code, and facilitate economic development." The planning department further stated it was "recommending that an effort be undertaken to prepare a more comprehensive amendment of the sign ordinance."

The planning department prepared a notice of exemption for Ordinance No. 5172, relying on several exemptions from CEQA review: (1) the statutory exemption for amendment of a local coastal program (CEQA Guidelines, § 15265), (2) class 5 and 11 categorical exemptions for minor alterations in land use limitations (CEQA Guidelines, §§ 15305, 15311) and accessory structures, and (3) the common sense exemption which applies when "it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment" (CEQA Guidelines, § 15061, subd. (b)(3)). In 2014, the Board found the proposed amendment to be exempt from CEQA review and approved Ordinance No. 5172.

5. *Other Planned Changes to the County Code*

At or around the same time it was considering the aforementioned ordinances, the planning department was also contemplating revisions to the County's "Wireless Communications Facility and Broadband Ordinance" (County Code, § 13.10.660-668). Other code amendments under development by planning department staff included modernization of the "use charts" of each zoning district within the agricultural, commercial, industrial, residential, and other districts.

In a letter to the Board in June 2014, the planning department recommended amending the County Code to clarify and streamline permit requirements and application review procedures. The planning department noted that in addition to updating the use charts for agricultural zone districts, "planning staff [was] proposing a more comprehensive update of the agricultural regulations in the County Code." In a separate letter, the planning department indicated it was contemplating amendments to agricultural

5

fencing regulations, and it was recommending a separate environmental review for the project.

6. *Petition for Writ of Mandate*

On March 19, 2014, Aptos Council filed a petition for a writ of mandate. The petition challenged the County's actions in 2014 approving the three ordinances related to minor exceptions, hotels, and signs. Aptos Council argued the sign ordinance was not exempt from CEQA review, the County's negative declaration prepared for the hotel ordinance should have taken into consideration future developments, and the County had improperly engaged in unlawful piecemeal review of the environmental impacts of the various ordinances.[2]

On September 4, 2015, the trial court issued an order and judgment denying Aptos Council's petition for a writ of mandate. The trial court concluded the County's "regulatory reform efforts" were not a single project for purposes of CEQA, there was no substantial evidence in the record to support a fair argument the hotel ordinance had a reasonably foreseeable effect on the environment, and the sign ordinance was exempt from CEQA review. Aptos Council appealed.

**DISCUSSION**

1. *Piecemeal Review*

Aptos Council argues the County's adoption of Ordinance Nos. 5171, 5172, and 5181 all constitute a single project under CEQA—the County's effort toward reforming and modernizing zoning regulations. Therefore, it claims the County improperly piecemealed review of environmental impacts when it independently and individually considered each ordinance. As we explain below, we disagree with Aptos Council's

---

[2] Aptos Council raised the issue of piecemealing before the County numerous times when the ordinances at issue were passed.

6

interpretation and do not find the adoption of the three ordinances in question to be a single project under CEQA.

a. **Overview and Standard of Review**

"The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*).)

CEQA requires the preparation of an environmental impact report (EIR) whenever a public agency proposes to approve or to carry out a project that may have significant impacts on the environment. (§§ 21100, 21151.) "An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' " (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.)

" 'Project' is a term of art. 'CEQA broadly defines a "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and . . . [¶] . . . [¶] . . . that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." [Citation] [¶] The statutory definition is augmented by the [CEQA Guidelines], which define a "project" as "*the whole of an action*, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." ' " (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1220 (*Banning Ranch*).)

Of vital import is the timing of the preparation of the EIR. "A basic tenet of CEQA is that an environmental analysis 'should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program

7

and design and yet late enough to provide meaningful information for environmental assessment.' " (*Laurel Heights*, *supra*, 47 Cal.3d at p. 395.)  Early environmental review may be detrimental to public coffers, but late environmental review may cause projects to clash with bureaucratic processes that are already in play, creating incentives to ignore potential environmental impacts.  (*Ibid*.)  Therefore, " ' "EIRs should be prepared as early in the planning process as possible to enable environmental considerations to influence project, program or design." ' "  (*Ibid*.)

"There is no dispute that CEQA forbids 'piecemeal' review of the significant environmental impacts of a project."  (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Comrs.* (2001) 91 Cal.App.4th 1344, 1358.)  "This standard is consistent with the principle that 'environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal impact on the environment—which cumulatively may have disastrous consequences.' " (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.)

In *Laurel Heights*, our Supreme Court held that "an EIR must include an analysis of the environmental effects of future expansion or other action if:  (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects.  Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.)

Whether the challenged ordinances constitute a single project under CEQA and whether the County improperly engaged in piecemeal environmental review are questions of law that we review independently.  (*Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1224.)

8

b. **Analysis**

At issue is whether the County's passage of the three ordinances in question constitutes a single project under CEQA. "The California Supreme Court has considered how to interpret the word 'project' and concluded that CEQA is 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1222 (*Tuolumne County*).) "Project" as defined by CEQA is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (§ 21065.)

Aptos Council relies on CEQA Guidelines sections 15378, subdivision (a), 15165, and 15168, subdivision (a) in coming to the conclusion that the amendments to these ordinances constitute a single project, requiring a single EIR. First, Aptos Council opines that CEQA Guidelines section 15378, subdivision (a) defines a "project" as "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following," including "enactment and amendment of zoning ordinances."

Based on this definition, Aptos Council surmises the County's overhaul of its zoning ordinances constitutes a single project. And CEQA Guidelines section 15165 provides that "[w]here individual projects are, or a phased project is, to be undertaken and where the total undertaking comprises a project with significant environmental effect, the lead agency shall prepare a *single* program EIR for the ultimate project as described in Section 15168." (Italics added.) CEQA Guidelines section 15168, subdivision (a) defines a program EIR as "an EIR which may be prepared on a series of actions that can be characterized as one large project and are related either: [¶] (1) Geographically, [¶]

9

(2) As logical parts in the chain of contemplated actions, [¶] (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or [¶] (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways." Aptos Council argues the County's various efforts toward overhauling its County Code satisfy these last three definitions.

Aptos Council is correct that, read together, CEQA Guidelines sections 15378, 15165, and 15168 interpret CEQA to require the preparation of a *single* program EIR for a series of actions that are properly characterized as a large project. We also agree with Aptos Council to the extent it argues that certain proposals that amend local ordinances or codes dealing with issues such as zoning may fall within the purview of a single "project" under CEQA. We do not, however, find the County's actions in this particular instance—engaging in reform of the zoning code—is a single project under CEQA as discussed in *Laurel Heights*, *supra*, 47 Cal.3d at page 396.

In *Laurel Heights*, our Supreme Court held that "an EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.)

Courts have found that agencies improperly piecemealed environmental review of projects in various situations. "First, there may be improper piecemealing when the purpose of the reviewed project is to be the first step toward future development." (*Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1223.) For example, in *Laurel Heights*, the Supreme Court determined the University of California, San Francisco improperly

10

piecemealed environmental review of the relocation of its pharmacy school to a building in the Laurel Heights neighborhood of San Francisco. The EIR acknowledged the university would occupy the entire Laurel Heights building when the remainder of the space became available. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.) It also estimated how many faculty, staff, and students would populate the entire building at full occupancy. The EIR, however, failed to discuss additional environmental effects that would result from the university's use of the remaining building space. (*Id.* at p. 393.) The Supreme Court found the university improperly piecemealed environmental review, because it was "indisputable that the future expansion and general type of future use [was] reasonably foreseeable." (*Id.* at p. 396.)

Additionally, "[t]here may be improper piecemealing when the reviewed project legally compels or practically presumes completion of another action." (*Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1223.) For example, in *Tuolumne County*, the appellate court determined the City of Sonora improperly piecemealed review of the building of a shopping center and the widening of a street, because the widening of the street was a condition precedent to the development. (*Tuolumne County*, *supra*, 155 Cal.App.4th at p. 1226.)

There is no piecemealing, however, when "projects have different proponents, serve different purposes, or can be implemented independently."[3] (*Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1223.)

---

[3] In its reply brief, Aptos Council argues the County erroneously applies the "independent utility" doctrine derived from *Del Mar Terrace Conservancy*, *Inc*. *v*. *City Council* (1992) 10 Cal.App.4th 712, 733 when discussing *Banning Ranch*. Several times in its respondent's brief, the County references *Banning Ranch*, *supra*, 211 Cal.App.4th at page 1223 and concludes that when each action has independent utility and does not subsume or necessitate each other, the actions may properly undergo separate environmental review. The term "independent utility" is not found in *Banning Ranch*. (continued)

11

Aptos Council insists the County's actions here are analogous to the actions contemplated in *City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438 (*Santee*). In *Santee*, the County of San Diego (San Diego) prepared an EIR defining the project as the construction and operation of an interim men's detention facility and the expansion of a women's facility in the city. (*Id.* at p. 1450.) The appellate court determined the EIR was deficient, because the EIR was considered one small part of San Diego's larger project to ease jail overcrowding. (*Id.* at p. 1454.) The agency had asked staff to prepare reports on other methods to deal with the jail overcrowding problem, the EIR cast doubts on the removal of the temporary project within a specified time frame, and the agency had expressed an intent to remove the expanded facility or relocate it after it was completed. (*Ibid.*)

*Santee*, however, is distinguishable. We find the agency's failure to take into account the entirety of the jail expansion project in *Santee* readily satisfies the test set forth in *Laurel Heights*. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396; *Santee*, *supra*, 214 Cal.App.3d at p. 1453.) The future impacts of the jail expansion were reasonably foreseeable consequences of the initial temporary expansion project. (*Santee*, *supra*, at p. 1454.) And the future jail expansion measures would logically—and likely—change the scope or nature of the initial project.

Unlike the project contemplated in *Santee*, we do not believe the County's reform efforts meet the *Laurel Heights* requirements. Instead, we find the situation contemplated in *Banning Ranch* to be analogous to the one presented here. In *Banning Ranch*, the City of Newport Beach (Newport Beach) considered a development project and prepared an EIR for the Newport Banning Ranch (NBR) Project, a development that would construct residential dwelling units, commercial space, and resort accommodations. (*Banning*

We believe the County is merely using the term to describe how each action has a separate *purpose*, as described in *Banning Ranch*.

12

*Ranch*, *supra*, 211 Cal.App.4th at p. 1216.) Development of the project would require an access road. In its notice of preparation of an EIR for the NBR Project, Newport Beach repeatedly referred to its proposed plan to build a park, Sunset Ridge Park, and stated that access to the park would be from the planned access road to be developed with the NBR Project. (*Ibid*.) Two months after issuing the notice of the preparation of the EIR for the NBR Project, Newport Beach issued a notice of preparation of an EIR for the Sunset Ridge Park project. (*Ibid*.) The park's EIR also analyzed the access road. (*Id*. at p. 1217.)

The plaintiff in *Banning Ranch* submitted comments during the public review period arguing Newport Beach was piecemealing review of the project. (*Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1217.) In essence, the plaintiff argued the NBR Project and the Sunset Ridge Park Project should be analyzed in a single EIR. Applying the Supreme Court's two-part *Laurel Heights* test, the appellate court disagreed. (*Id*. at pp. 1224-1227.) The park and the NBR Project served two different purposes; one developed a new neighborhood, the other provided residents with recreational opportunities. (*Id*. at p. 1226.) Furthermore, Newport Beach would build the park even if the NBR Project did not go forward. (*Ibid*.) Therefore, the appellate court found the park's EIR adequately defined the project without inclusion of the NBR Project, and Newport Beach was not improperly giving them piecemeal review. (*Id*. at p. 1227.) The appellate court concluded "[t]he access road is consistent with the NBR project," but it was "a stretch to say the NBR project is a consequence of the access road." (*Id*. at p. 1226.)

Akin to *Banning Ranch*, the County's consideration of the three ordinances dealing with minor exceptions, hotels, and signs does not satisfy *both* of the criteria set forth in *Laurel Heights*. We agree that the County's approval of various zoning regulations *could* conceivably impact the scope or nature of other regulations. We also

13

agree with Aptos Council that the reforms are reasonably foreseeable, because the record reflects the County was considering multiple regulatory reforms and was actively preparing amendments to an assortment of zoning regulations. *Laurel Heights*, however, dictates that an EIR must include an analysis of future environmental effects of a future expansion or other action only if the future expansion or action is a "reasonably foreseeable *consequence*" of the project. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396, italics added.)

The key term here is "consequence." Thus, the issue is whether changing or reforming certain zoning regulations—for example, altering the density requirements for hotels and reducing the required number of parking spaces per hotel room—are reasonably foreseeable *consequences* of the other regulatory reforms challenged by Aptos Council, such as eliminating the need to obtain a variance for certain signs, or expanding administrative approval of minor exceptions to the entire county. We do not believe they are. Like the two projects contemplated in *Banning Ranch*, the regulatory reforms operate independently of each other and can be implemented separately.[4]

Aptos Council maintains the ordinances all serve the County's same stated goal to modernize the County Code, loosen standards, and reduce barriers to development within the County. Although the ordinances can be considered a part of what the County characterizes as its efforts toward regulatory reform of various zoning ordinances, each of the contemplated ordinances are separate and apart from each other. In other words, they serve different purposes. (*Banning Ranch*, *supra*, 211 Cal.App.4th 1209.)

---

[4] We note that there are differences between this case and *Banning Ranch*. Specifically, the projects have the same proponent, the County. Nonetheless, we do not believe that having the same proponent compels a contrary conclusion. CEQA does not mandate a single EIR for two unrelated projects simply because they are being contemplated by the same agency at the same time. Unless the two requirements set forth under *Laurel Heights* are met, a single environmental review is not necessary.

14

The cases and principles cited by Aptos Council are inapplicable. First, *Orinda Assn. v. Board of Supervisors* (1986) 182 Cal.App.3d 1145 is inapposite. There, the appellate court concluded an EIR prepared for the development of a complex failed to take into account the demolition of existing buildings on the project site. (*Id.* at pp. 1171-1172.) The EIR had described the project under review as *both* the removal of existing improvements and the construction of a new building complex. (*Id.* at p. 1172.) *Orinda* was decided before the Supreme Court's decision in *Laurel Heights*. It is, however, apparent that the demolition and construction projects contemplated in *Orinda* would have satisfied the two requirements set forth in *Laurel Heights*: the demolition of existing structures was a reasonably foreseeable consequence of the development project, and the demolition would change the scope or nature of the development's environmental effects. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.)

Aptos Council also relies on *Tuolumne County*, which rejected the argument that projects are not integral unless they cannot be implemented independently. (*Tuolumne County*, *supra*, 155 Cal.App.4th at p. 1229.) There, the court noted that "[t]he idea that all integral activities are part of the same CEQA project does not establish that *only* integral activities are part of the same CEQA project." (*Ibid.*) Additionally, whether projects are "integral" to each other is not dependent on whether they can be implemented independently. Thus, *Tuolumne* held that projects are "integral" if the activity is part of the "whole of an action" for the purpose of CEQA Guidelines, section 15378, subdivision (a). (*Tuolumne County*, *supra*, at p. 1330.) In other words, if projects are " 'various steps which taken together obtain an objective,' " they are a single project for the purposes of CEQA. (*Id.* at p. 1226.)

Aptos Council claims *Tuolumne* is applicable, because the County's various efforts at amending zoning regulations can be seen as steps taken toward a greater overarching effort to overhaul the County's zoning regulations as a whole. The *facts* of

*Tuolumne County*, however, are readily distinguishable. The issue in *Tuolumne County* was whether the proposed development of a home improvement center should have also considered a road realignment project. (*Tuolumne County*, *supra*, 155 Cal.App.4th at p. 1226.) The appellate court determined the road realignment and development projects were closely connected and constituted a single project. (*Id*. at pp. 1226-1227.) The road realignment and proposed development were related in time, physical location, and the entity undertaking the action. (*Id*. at p. 1227.) Although it was theoretically possible to complete the proposed development *without* the road realignment, the development could not be opened legally without completing the road realignment. (*Id*. at pp. 1230-1231.) The projects' "independence was brought to an end when the road realignment was added as a condition to the approval of the home improvement center." (*Id*. at p. 1231.)

Here, it stretches the imagination to conceive that amending an ordinance regarding hotel densities, extending minor exceptions, and amending a sign ordinance are, taken together, various steps toward achieving an "objective" as articulated in *Tuolumne County*. "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights*, *supra*, 47 Cal.3d at p. 390.) We do not believe, however, that Aptos Council's interpretation is reasonable in these circumstances.

The "objective" of modernizing the County Code is vague. It is not the type of tangible "objective" that has been found to be the basis of a CEQA project. Modernizing and updating the County Code is not, like the objective contemplated in *Tuolumne County*, analogous to the development of a home improvement center and realignment of a road. All of the cases cited by Aptos Council deal with the environmental review and

16

approval of specific development projects. None of them involve the adoption of various unrelated reforms in the context of updating or modernizing regulations.[5]

Aptos Council maintains that allowing the County to proceed and separately review each proposed reform to Chapter 13.10 would disguise the true extent of the County's reform efforts and would fail to sound the environmental "alarm bell" for County residents. Early environmental review is preferred, but "premature environmental analysis may be meaningless and financially wasteful." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.) Applying Aptos Council's logic would require the County to wait to begin environmental review and implementation of any reform to Chapter 13.10 until the County has decided precisely what language to use and which ordinances to enact. The County's effort to modernize certain parts of the County Code is not fixed. Although there are certain codes and ordinances the County has researched and has determined it will amend, the County asserts that specific amendments are far from set in stone. Engaging in a single environmental review this early in the process would therefore be meaningless.

Aptos Council's citation to *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61 undermines its own argument. In *San Franciscans*, the appellate court analyzed the adequacy of a cumulative impact analysis in the EIRs prepared for the construction of several high-rise office buildings in the city's downtown area. (*Id*. at p. 67.) The appellate court concluded that related high-rise projects under review should be included in the cumulative analysis. (*Id*. at pp. 76-77.) The court reasoned "the development of downtown San Francisco generally occurs bit by bit. No one project may appear to cause a significant amount of adverse

---

[5] We reiterate that we do not mean to hold that the passing of several ordinances can never fit within the definition of a single project under CEQA as articulated in *Laurel Heights*. Our conclusion is limited to the specific facts of this case.

17

effects. However, without a mechanism for addressing the cumulative effects of individual projects, there could never be any awareness of or control over the speed and manner of downtown development. Without such control, piecemeal development would inevitably cause havoc in virtually every aspect of the urban environment." (*Ibid.*)

Aptos Council argues the problem contemplated in *San Franciscans* is analogous to the trouble that will be created if the regulatory reforms are not considered a single project under CEQA. *San Franciscans*, however, brings up a point that the County makes in its respondent's brief—that CEQA mandates agencies to take into account the cumulative impacts of projects. For example, in the context of preparing an EIR, projects cannot be considered in isolation. Part of the " 'vital informational function' " of an EIR stems from its cumulative impact analysis. (*Bakersfield Citizens for Local Control v*. *City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1214.)

Thus, CEQA mandates that when an agency is considering whether a project has a significant effect on the environment requiring the preparation of the EIR, the agency shall find a significant effect if "[t]he project has possible environmental effects that are individually limited but cumulatively considerable. 'Cumulatively considerable' means that the incremental effects of an individual project are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (CEQA Guidelines, § 15065, subd. (a)(3).) Accordingly, an agency cannot prepare a negative declaration if, taking into consideration the effects of past, current, and probable future projects, the environmental effect is significant. Similarly, categorical exemptions from CEQA also cannot be found if "the cumulative impact of successive projects of the same type in the same place, over time is significant." (CEQA Guidelines, § 15300.2, subd. (b).)

In its reply brief, Aptos Council argues that although CEQA mandates consideration of these cumulative impacts, the negative declarations and exemptions

18

below do not reflect that this type of analysis occurred. First, Aptos Council did not raise this point in its opening brief. In general, " '[p]oints raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument.' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) Furthermore, as argued by the County below, the County's failure to address the purported cumulative impacts is readily explained. At the time the ordinances were considered, other regulatory reforms that may have cumulative impacts had not yet come to fruition. When future reforms are considered for environmental review, the cumulative impacts of all related reforms, as articulated in the CEQA Guidelines, will be examined.

In sum, we do not find the County erroneously engaged in piecemeal environmental review when it evaluated the ordinances and their respective environmental impacts separately.

2. *Negative Declaration for the Hotel Ordinance*

Next, Aptos Council argues the negative declaration prepared for the amendments to the hotel ordinance was inadequate, because it failed to take into consideration the inevitable future developments the ordinance would permit. As set forth below, we find the County did not err when it adopted the negative declaration. Future developments were too speculative to be reasonably foreseeable, and there was no substantial evidence supporting a fair argument that the ordinance would have a significant environmental impact.

a. **The Negative Declaration, Initial Study, and Aptos Council's Arguments**

The negative declaration for the hotel ordinance found it would have no significant environmental impact. First, with regards to the ordinance's proposal to reduce the existing hotel density requirement of 1,300 square feet per habitable room to 1,100 square feet per habitable room, the County's initial study noted "[t]he number of

19

hotel rooms . . . could increase through the removal of the density limitation, yet would remain constrained by setback requirements, design standards and availability of parking."

Next, the initial study addressed the hotel ordinance's elimination of the three-story limit for hotels. The County found this could allow development of four-story hotels so long as design standards and the overall existing height limit (County Code, § 13.10.333) were met. Under the County Code, there is a height limit of 35 feet, which may be extended by an additional five feet under certain circumstances as outlined in County Code section 13.10.510. The initial study also addressed the ordinance's amendment to the parking requirements for hotels, noting the current parking requirements were not aligned with modern hotel projects, which often have more suites.

The negative declaration generally characterized the amendments as having no physical impacts on the environment, because future developments would be subject to further discretionary approval. Thus, Aptos Council argues the negative declaration improperly defers an analysis of future impacts to the future when they are presently reasonably foreseeable. Aptos Council cites to a letter drafted by the City of Santa Cruz Water Department, which asserted the negative declaration should provide information on the number of affected parcels and changes in build out potential that could occur because of the ordinance, potential changes in the projected water demand due to the amendments, and an analysis of the City of Santa Cruz's ability to meet these new water demands.

In response to this comment letter, the planning department stated the "project consists of regulatory changes, which by themselves will have no physical effect on the environment. It is therefore not possible to know the exact number of rooms that might be allowed as part of any specific development proposal that may be proposed in the future. For this reason, CEQA provides a process for performing environmental review

on a programmatic level for projects such as ordinance amendments. When a particular development is proposed, it will be subject to full CEQA review, and at that time water supply availability and any impact on water supply can be evaluated and addressed. Specifically, no new development can be approved, pursuant to the general plan and County Code, if a 'will serve' commitment from the water purveyor has not been issued. At this time, there is no substantial evidence that there are cumulative effects associated with the proposed ordinance amendments."

The County also contacted the owners of two of the most prominent vacant lots in the unincorporated area currently zoned for visitor accommodations. None of the owners had foreseeable plans to sell or develop their properties. Therefore, the County concluded there was nothing on which it could base its analysis of the impacts resulting from future developments, and it would be speculative to define what types of projects may be proposed.

b. **Overview and Standard of Review**

CEQA requires agencies to prepare an EIR for any project that will have a significant effect on the environment. (§ 21151.) "If a project is not exempt from CEQA and there is a reasonable possibility the project may have a significant environmental impact, the public agency must conduct an initial threshold study. If that study shows there will be no significant environmental impact, the agency may issue a negative declaration for the project." (*Sierra Club v. California Dept. of Forestry & Fire Protection* (2007) 150 Cal.App.4th 370, 380 (*Sierra Club*).) A decision by an agency to adopt a negative declaration is essentially a determination that the project will not have a significant environmental impact. (*Citizen Action to Serve All Students v. Thornley* (1990) 222 Cal.App.3d 748, 754.) Therefore, CEQA mandates "a low threshold requirement for preparation of an EIR." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 84.) "[A] public agency must prepare an EIR whenever substantial evidence

21

supports a fair argument that a proposed project 'may have a significant effect on the environment.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123.)

"Environment" is defined as "the physical conditions which exist within the area which will be affected by a proposed project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (CEQA Guidelines, § 15360.) Effects may include "[i]ndirect or secondary effects which are caused by the project and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect or secondary effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on air and water and other natural systems, including ecosystems." (CEQA Guidelines, § 15358, subd. (a)(2).) "In evaluating the significance of an environmental effect of a project, the lead agency shall consider direct physical changes in the environment which may be caused by the project and reasonably foreseeable indirect physical changes in the environment which may be caused by the project." (CEQA Guidelines, § 15064, subd. (d).)

An agency must generally "conduct an initial study to determine if the project may have a significant effect on the environment" unless it "can determine that an EIR will clearly be required for the project . . . ." (CEQA Guidelines, § 15063, subd. (a).) "The initial study as a standardized document 'is largely a creature of the Guidelines . . .' and 'CEQA refers to [an initial study] only glancingly (e.g., § 21080, subd. (c)(2)).' [Citation.] It is now well established, however, that an initial study is the preliminary environmental analysis (see [CEQA] Guidelines, § 15365) and its purposes include '[p]rovid[ing] the lead agency with information to use as the basis for deciding whether to prepare an EIR or negative declaration,' '[e]nabl[ing] an applicant or lead agency to modify a project, mitigating adverse impacts before an EIR is prepared, thereby enabling

22

the project to qualify for a negative declaration,' and '[p]rovid[ing] documentation of the factual basis for the finding in a negative declaration that a project will not have a significant effect on the environment.' ([CEQA] Guidelines, § 15063, subd. (c)(1), (2), (5).)" (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1180.)

In a mandamus action alleging an agency failed to comply with CEQA, "the inquiry shall extend only to whether there was a prejudicial abuse of discretion." (§ 21168.5.) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Ibid.*)

" 'The standard of judicial review of an agency decision to adopt a negative declaration is whether there is substantial evidence in support of a "fair argument" of potential environmental impact.' [Citation.] Substantial evidence ' "[m]eans enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion . . . ." ' [Citations.] Substantial evidence does not include argument, speculation, or unsubstantiated opinions or concerns about a project's environmental impact." (*Sierra Club*, *supra*, 150 Cal.App.4th at p. 381.) "Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (§ 21082.2, subd. (c).) " 'Relevant personal observations of area residents on nontechnical subjects may qualify as substantial evidence.' " (*Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 730.) "[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1417.)

"Thus, the fair argument standard of review is not the typical substantial evidence standard, i.e., whether there is substantial evidence to support the decision not to prepare

23

an EIR. Rather, the fair argument standard of review is whether, after examining the entire record, there is substantial evidence to support a fair argument that a project may have a significant effect on the environment." (*Sierra Club*, *supra*, 150 Cal.App.4th at p. 381.)

"The fair argument standard is a 'low threshold' test for requiring the preparation of an EIR. [Citations.] It is a question of law, not fact, whether a fair argument exists, and the courts owe no deference to the lead agency's determination. Review is de novo, *with a preference for resolving doubts in favor of environmental review*." (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928.)

c. **Analysis**

Below to the trial court and in its opening brief on appeal, Aptos Council reiterates its argument that the negative declaration prepared by the County was inadequate, because it failed to take into consideration the impacts from future developments that would be permitted by the ordinance. A "negative declaration is inappropriate where the agency has failed either to provide an accurate project description or to gather information and undertake an adequate environmental analysis." (*City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 406 (*City of Redlands*).) Therefore, Aptos Council insists the County failed to act in the manner required by law.

Aptos Council maintains that *City of Redlands* is analogous. There, the County of San Bernardino approved amendments to its general plan relating to land use regulation of unincorporated territory and adopted a negative declaration. (*City of Redlands*, *supra*, 96 Cal.App.4th at p. 403.) The amendments related to "sphere of influence" areas, which designated probable physical boundaries and service areas for local agencies. (*Ibid.*) Two cities filed petitions for a writ of mandate arguing San Bernardino failed to comply with CEQA when it did not prepare an EIR. (*Id.* at pp. 403-404.)

24

First, the *City of Redlands* court held San Bernardino's project description was inaccurate. The court concluded "the amendments eliminated the requirement that [San Bernardino] give substantial weight to and even implement the standards provided in an affected city's general plan. [¶] . . . Under the new amendments, where a conflict between city and county standards exist, [San Bernardino] has granted itself discretion to override city standards in making decisions concerning land within that city's sphere of influence." (*City of Redlands*, *supra*, 96 Cal.App.4th at pp. 407-408.) Therefore, the appellate court determined: "[T]he initial threshold study is inadequate because it fails to provide sufficient evidence or analysis of the potential environmental effects of the amendments. 'The agency should not be allowed to hide behind its own failure to gather relevant data.' Although the amendments essentially indicate a movement away from a city's standards and a movement toward county's exercise of greater discretion, [San Bernardino] does not provide evidence to show how such a shift in policy would have little or no effect on the environment." (*Id.* at p. 408, fns. omitted.)

The court also held that CEQA extends beyond changes in the agency's policy to the "ultimate consequences of such changes to the physical environment." (*City of Redlands*, *supra*, 96 Cal.App.4th at p. 409.) San Bernardino stated that the proposed changes, by themselves, did not lead to significant impacts, because " 'future projects within the spheres will be evaluated on their own merits based on the issues associated with each individual sphere where the project occurs.' " (*Ibid.*) The appellate court found this response to be inadequate. Although San Bernardino claimed it anticipated no future developments, the record clearly indicated the existence of *potential* future development and at least one existing project undergoing environmental review. (*Ibid.*) San Bernardino both acknowledged the amendments may result in greater development, but paradoxically insisted the amendments would have no significant effect on the environment. Therefore, the court determined San Bernardino failed to adequately

consider future development when adopting its negative declaration and should not have deferred full environmental assessment of the consequences of the amendments. (*Id*. at pp. 410-411.)

In a related context, courts have also considered whether probable future development should be considered in an EIR. For example, Aptos Council also relies on *City of Carmel by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229 (*City of Carmel*). In *City of Carmel*, the proposed project was a rezoning of a resort hotel by the city. The resort hotel applied for a rezoning of the property from open space to a different designation that would allow the owners to either apply for a use permit for continued use of the property as a resort or for clustered residential use. (*Id*. at p. 234.) The rezoning also necessitated identification of the portion of the property that was considered wetlands that would remain subject to the open space classification. (*Ibid*.) Reviewing the record, the court determined there was substantial evidence that supported a fair argument that rezoning the area may result in a significant environmental impact. (*Id*. at pp. 244-245.) Concerned neighbors and citizens had presented opinions and observations on how the expanded use of the rezoned property may increase noise pollution, create heavy traffic, and have an impact on population density. (*Id*. at p. 246.) The rezoning designation would also permit uses that did not presently exist that could significantly expand the property's current use. (*Ibid*.)

*City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325 (*City of Antioch*) is also analogous. There, the City of Pittsburg issued a negative declaration for a project constructing a roadway and appurtenant utilities, including a sanitary sewer system. (*Id*. at p. 1329.) In part, Pittsburg determined the roadway was consistent with the general plan and the project would not have a significant environmental effect. The project itself did not involve the connection of the proposed street to an existing street and did not involve the construction of buildings or introduction of any land uses that did not

26

presently exist. (*Ibid*.) Pittsburg argued any future construction would be subject to further environmental review. (*Id*. at p. 1331.) The plaintiffs petitioned for a writ of mandate, arguing Pittsburg should have prepared an EIR instead of negative declaration. (*Id*. at p. 1330.) The writ was denied, and the appellate court reversed this decision. (*Ibid*.)

First, the appellate court noted that conformity with a general plan does not insulate a project from an EIR requirement. (*City of Antioch*, *supra*, 187 Cal.App.3d at p. 1332.) The appellate court also rejected Pittsburg's argument that since it was unknown what type of development would occur on the surrounding undeveloped land and an infinite number of potential developments existed, it did not need to prepare an EIR. (*Id*. at pp. 1333-1334.) The planning department itself recognized that construction of the roadway would open the area for future development. (*Id*. at p. 1334.) The court recognized that the "sole reason to construct the road and sewer project [was] to provide a catalyst for further development in the immediate area." (*Id*. at p. 1337.) The plaintiffs pointed to evidence in the record that significant environmental impacts may result from the development, including the potential traffic impact on a local highway and road, train traffic problems, impact of a future train station at the site, concerns with noise, impacts with utilities, and air quality impacts. Technical engineering concerns were also raised, including possible downstream drainage problems. (*Id*. at p. 1334, fn. 3.)

*City of Antioch* concluded that although Pittsburg "cannot be expected to know the exact level of use of the roadway at such time as it is connected to existing highways, it must assume a level of use at that time that now seems probable. Similarly, while Pittsburg need not predict the precise form, location and amount of commercial and residential development resulting from construction of the roadway and utilities, it cannot pretend none will occur; it simply must assume the *general* form, location and amount of such development that now seems reasonable to anticipate, as the developer has doubtless

27

already done, and evaluate that development by means of the EIR process." (*City of Antioch*, *supra*, 187 Cal.App.3d at p. 1338.)  Pittsburg was thus obligated to evaluate "the forms and extent of future development that now reasonably seem most likely to result from the roadway and utility projects." (*Ibid*.)

Similarly, in *Stanislaus Audubon Society*, *Inc*. *v*. *County of Stanislaus* (1995) 33 Cal.App.4th 144 (*Stanislaus Audubon Society*), the court concluded there was substantial evidence of a fair argument that a proposed country club may have significant adverse growth-inducing effects on the surrounding area.  (*Id*. at p. 152.)  There, after an initial study, the planning department initially found the project would have significant growth-inducing effects and may have impacts on traffic.  (*Id*. at p. 153.)  In a revised study, the planning department reversed its position and concluded the growth-inducing effects need not be addressed, recommending that impacts of future developments be evaluated at the time actual housing projects are proposed.  (*Id*. at p. 154.)  The court concluded the county improperly "avoided evaluation of this impact" by deferring consideration of the growth-inducing impacts.  (*Id*. at p. 152.)  Additionally, the court held:  "[t]he fact that the exact extent and location of such growth cannot now be determined does not excuse the County from preparation of an EIR.  Just as in [*City of Antioch*], review of the likely environmental effects of the proposed country club cannot be postponed until such effects have already manifested themselves through requests for amendment of the general plan and applications for approval of housing developments. . . .  '[r]equiring [an EIR] early in the process enables decision makers to make determinations upon adequate data.' " (*Id*. at pp. 158-159, fn. omitted.)

We note that *City of Carmel*, *City of Antioch*, and *Stanislaus Audubon Society* concern a different issue:  whether there was substantial evidence of a fair argument that a proposed project may have a significant environmental effect.  Here, our initial inquiry is not whether a fair argument that a significant environmental impact may result from

28

the project exists; rather, it is whether the negative declaration and corresponding initial study should have taken into account the impacts of future development.[6] Nonetheless, we find the aforementioned cases relevant. They establish that when evaluating the potential environmental impact of a project that has growth inducing effects, an agency is not excused from environmental review simply because it is unclear what future developments may take place. It must evaluate and consider the environmental effects of the "most probable development patterns." (*City of Antioch*, *supra*, 187 Cal.App.3d at p. 1337.)

These cases, however, also reiterate the principle that CEQA mandates only the consideration of "*reasonably foreseeable* indirect physical changes in the environment which may be caused by the project." (CEQA Guidelines, § 15064, subd. (d), italics added.) "A change which is speculative or unlikely to occur is not reasonably foreseeable." (*Id.*, subd. (d)(3).) *City of Redlands*, *City of Carmel*, *City of Antioch*, and *Stanislaus Audubon Society* all concerned potential impacts that were nebulous and not yet defined, because actual development had not been proposed. Yet the cases share a commonality: the potential impacts were all *reasonably foreseeable*. Thus, they comported with the principle set forth in *Laurel Heights* that an EIR must include an analysis of a future project or expansion if "(1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.)

For example, in *City of Redlands*, the County stated it did not anticipate that future development would result from the changes made to the general plan, but the record indicated the existence of potential future development and at least one project already

---

[6] We address whether there is a fair argument that the ordinance may have a significant environmental impact in more detail below.

undergoing environmental review. (*City of Redlands*, *supra*, 96 Cal.App.4th at p. 409.) In *City of Antioch*, although the creation of the sewage line and appurtenant utilities was a catalyst for future development that was unknown, future development was reasonably foreseeable. In fact, the sewage line and appurtenant utilities were created to facilitate future development in the area. (*City of Antioch*, *supra*, 187 Cal.App.3d at p. 1337.) Similarly, in *Stanislaus Audubon Society*, the planning department itself had already determined in a prior initial study that the development of the country club would have a growth inducing effect. (*Stanislaus Audubon Society*, *supra*, 33 Cal.App.4th at p. 154.) Impacts stemming from this potential growth were therefore reasonably foreseeable. In *City of Carmel*, the rezoning project represented a "commitment to expanded use of the property, in addition to finally fixing the size of an environmentally sensitive area [the wetlands]." (*City of Carmel*, *supra*, 183 Cal.App.3d at p. 244.)

Thus, the issue is whether increased hotel developments, such as hotels proposed at higher densities than before, are a reasonably foreseeable consequence of the ordinance. The County argues they are not and characterizes the ordinances as merely modifying the standards for hotel development and preparing the County for appropriate review of a hotel development should one be submitted. In response, Aptos Council insists the County is ignoring its own stated reasons for pursuing the ordinance—to facilitate growth.

We disagree with Aptos Council's analysis and find the potential for future developments to be too speculative to be reasonably foreseeable. We agree that there is evidence in the record supporting the argument that the County adopted the ordinance to possibly stimulate the development of hotels. For example, the letter recommending a public hearing on the hotel ordinance indicated the amendments were proposed because the current County Code restricted hotel development, "particularly for higher quality accommodations, which in turn restricts the County's ability to compete for tourism

30

business in this key market segment." In the initial study, the County found that a limited number of new hotels had been approved in the unincorporated area, alluding that the prior County Code had "limited the County's ability to attract the demographic of the tourist market that can contribute most to local economic development." Unquestionably, these statements indicate a *hope* that hotel developments will occur as a result of the ordinances. Aptos Council, however, does not point to anything in the record to demonstrate increased development is reasonably foreseeable, rather than an "optimistic gleam in [the County's] eye." (*Topanga Beach Renters Assn. v. Department of General Services* (1976) 58 Cal.App.3d 188, 196.)

Additionally, it is apparent the County did take into consideration the potential impacts of future development in its negative declaration. The initial study noted the number of hotel rooms allowed on various parcels could increase due to the removal of density limitations. The initial study also explained the removal of the three-story limit for hotels may allow for the possible construction and design of four-story hotels. The impacts, however, would be speculative until it was known whether any developments would be proposed and, if developments are proposed, what type of hotels would be built. The negative declaration further concluded there would be no significant environmental impact, because any future developments would be subject to further environmental review under CEQA.

The County did not come to this conclusion without investigating or conducting studies. Rather, the County contacted the owners of the two most prominent vacant lots. The two owners expressed no foreseeable plan to either sell their land or pursue development. The County also tabulated the existing parcels and determined which parcels were vacant, which were developed, and how many already had visitor accommodation uses on site. Out of the 34 identified parcels, 20 were already developed

31

with visitor accommodation uses. And the ordinance did not permit the development of hotels in areas where hotels could not have been developed before.

The County must evaluate and consider the effects of the "most probable development patterns." (*City of Antioch*, *supra*, 187 Cal.App.3d at p. 1337.) The County, however, has essentially concluded there are no probable development patterns because it is unclear whether the ordinance *will* in fact induce future development, including development of higher density hotels. As articulated by the County, the type of future development that will be proposed is purely speculative at this point. In fact, development can be proposed at much lower densities. And there is nothing in the record to suggest that future development is presently being proposed. Certainly, when drafting an EIR or a negative declaration, an agency must necessarily engage in some forecasting. (CEQA Guidelines, § 15144.) "While foreseeing the unforeseeable is not possible, an agency must use its best efforts to *find out* and disclose all that it *reasonably* can." (*Ibid.*, italics added.) Nonetheless, it need not consider impacts that are too speculative. The CEQA Guidelines explain that "[i]f, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact." (CEQA Guidelines, § 15145.) After all, " 'where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences.' " (*Laurel Heights*, *supra*, 47 Cal.3d at p. 395.)

Additionally, the County responded to City of Santa Cruz Water Department's concern over the potential of the ordinance to increase water usage. The County noted that future developments would need to obtain a "will serve" letter from applicable water purveyors and must be consistent with the general plan policies that address potential impacts on water supplies. Therefore, the County concluded there were no reasonably foreseeable effects on the environment, and the negative declaration was adequate.

32

Lastly, we also agree with the County that Aptos Council failed to satisfy its burden to show there is a fair argument that significant environmental effects may result from the ordinance. Aptos Council's claims only amount to speculation about potential environmental impacts, and such speculation cannot amount to substantial evidence. (*Sierra Club*, *supra*, 150 Cal.App.4th at p. 381.) Pointing to a lack of evidence in the administrative record does not by itself constitute substantial evidence of a significant environmental impact. " 'An absence of evidence in the record on a particular issue does not automatically invalidate a negative declaration. "The lack of study is hardly evidence that there *will* be a significant impact." ' " (*Gentry v. City of Murrieta*, *supra*, 36 Cal.App.4th at p. 1379.) In essence, Aptos Council is merely speculating that the ordinance may have a significant effect. Aside from vague arguments that the ordinance will encourage development of higher density hotels, Aptos Council fails to adequately show there is substantial evidence in the record to support its fair argument claim.

Aptos Council argues that the County " 'should not be allowed to hide behind its own failure to gather relevant data.' " (*City of Redlands*, *supra*, 96 Cal.App.4th at p. 408.) Unlike *City of Redlands*, however, the County did investigate the potential growth that could occur as a result of the ordinance, as described above. The County is not basing its conclusion that denser hotel developments are speculative on its own failure to compile evidence. Rather, it simply concluded, contrary to Aptos Council's own belief, that the ordinance would not create any "reasonably foreseeable specific environmental impacts" after its consideration of the matter. In response, Aptos Council has not cited to evidence in the record to indicate the ordinance will be growth-inducing or that new hotel developments are a reasonably foreseeable consequence. At this point, environmental review of potential future developments would be an impossible task, because it is unclear what form future developments will take. The suggested

environmental impacts are simply not reasonably foreseeable at this time, and evaluation of the impacts would be wholly speculative.

Thus, we conclude the trial court did not err in denying Aptos Council's petition for a writ of mandate.[7]

**DISPOSITION**

The order denying Aptos Council's petition for a writ of mandate is affirmed. The County is entitled to its costs on appeal.

---

[7] In its respondent's brief, the County asks this court to affirm the trial court's findings that (1) the County properly adopted a negative declaration for the ordinance expanding minor exceptions, and (2) the County properly determined the sign ordinance was categorically and statutory exempt from CEQA review. Aptos Council does not challenge these findings on appeal. Issues not raised in the appellant's opening brief are deemed waived or abandoned. (*Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250, 1282.) We therefore decline to address these additional issues.

_____
Premo, J.

WE CONCUR:


_____
Rushing, P.J.


_____
Elia, J.


The Aptos Council v. County of Santa Cruz et al.
H042976

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court<br>Superior Court No. CV178868 |
| Trial Judge: | Hon. Paul M. Marigonda |
| Counsel for Plaintiff/Appellant:<br>The Aptos Council | Wittwer Parkin<br>William P. Parkin<br>Jonathan Wittwer<br>Alison Norton<br>Natalie Kirkish |
| Counsel for Defendants/Respondents:<br>County of Santa Cruz, Board of<br>Supervisors et al. | County Counsel, Dana McRae<br><br>T. Brooke Miller<br>Assistant County Counsel |

The Aptos Council v. County of Santa Cruz et al.
H042976