Filed 9/11/20 Sykes v. Equinox Holding, Inc. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| GAVIN SYKES, Plaintiff and Appellant, v. EQUINOX HOLDINGS, INC., Defendant and Respondent. | B280048 (Los Angeles County Super. Ct. No. BC552152) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly E. Kendig, Judge. Affirmed in part, reversed in part.

Berokim & Duel and Kousha Berokim for Plaintiff and Appellant.

Jackson Lewis, Yvonne Arvanitis Fossati, Hazel U. Poei and Philip A. Johnson for Defendant and Respondent.

_____

Gavin Sykes appeals from a judgment entered after the trial court granted summary judgment in favor of Sykes's former employer, Equinox Holdings, Inc., on Sykes's complaint for discrimination based on sexual orientation, sexual harassment, retaliatory discharge and related causes of action. Sykes contends he established triable issues of material fact on his causes of action. Sykes also appeals from the trial court's denial of Sykes's ex parte applications to strike or continue Equinox's motion and to submit supplemental opposition papers.

We reverse the trial court's order granting summary judgment and the judgment entered against Sykes. We reverse the trial court's separate order granting summary adjudication on Sykes's causes of action for sexual harassment and failure to prevent harassment because there are triable issues of material fact on those causes of action. We affirm the trial court's separate order granting summary adjudication on Sykes's causes of action for discrimination based on sexual orientation, retaliation, and wrongful termination, and his claim for punitive damages. Finally, because Sykes has not met his burden to show the trial court abused its discretion in denying his ex parte applications, we affirm those orders.

## PROCEDURAL AND FACTUAL BACKGROUND

A. *Sykes Begins Work at Equinox's West Hollywood Club*

Sykes was hired as an at-will employee at Equinox's West Hollywood club by its general manager, Marlene Avitia. He began work on January 25, 2013 as a front desk associate with a starting pay of $8.25 per hour. Sykes was responsible for greeting and checking in club members, and answering telephones at the front desk. Sykes reported to Thomas Hands, the club's front desk manager, who in turn reported to Nicole

2

Espinoza, an assistant manager.  Espinoza reported to Avitia.
Sykes is a bisexual male, although he did not reveal his sexual
orientation to anyone at Equinox.[1]

In late February 2013, while continuing to work at the
front desk, Sykes began a part-time position as an operations
administrator at $12.50 per hour.  Sykes worked half of his time
at the new position; approximately 20 hours per week.  When
Sykes worked as an operations administrator, he reported to Erin
Faulk, an administrator in Equinox's corporate office, and not to
Hands, Espinoza, or Avitia.  As an operations administrator,
Sykes ensured that Equinox and its personal trainers complied
with the labor laws regarding overtime compensation and meal
and rest breaks.  Sykes compared each trainer's payroll timecard
with his or her personal calendar to determine whether the
documents "coincided with one another."  If they did not, Sykes
recorded the discrepancies and proposed corrections on a
spreadsheet.  The discrepancies included personal trainers
"[h]aving too much overtime or not having enough overtime based
on not clocking out or not clocking in."  According to Sykes, he
was reporting the discrepancies and recommending changes to
ensure that the personal trainers were paid for all the time they
worked, they received overtime pay, and they were taking meal
breaks.  Each day, he forwarded the spreadsheet to Adam Farino,
the personal trainer manager.  Before Sykes "was allowed to fix
discrepancies" on Equinox's payroll system, Farino had to
approve each proposed correction, which could amount to 200

---

[1]     Sykes alleged he "is gay male of African American descent."
Sykes described himself as "half African American."

3

corrections per day.  According to Sykes, he "wasn't allowed to just [make the] change[s]."

B.     *Sykes Complains of "Fraud"*

According to Sykes, Farino told him "he didn't want to be bothered" with approving the corrections, and Farino "would come to [Sykes] in my office and say, I approve all of them, just change them."  Farino told Sykes to "just put in a time you think [the trainers] were here."  Sykes, when providing the missing time information for Equinox's payroll records, "personally tried [his] best based on what [he] knew . . . what hours [the trainers] actually worked."  Because of Farino's directive, "to make the edits myself without his approval," when Sykes made "the edits [himself] without [Farino's] approval," Sykes believed he was "forging records" and "breaking the law."  "He was asking me to forge timecards for him."  Sykes testified that Farino "had to physically go and write 'yes' on every single one or [he] was not permitted" to make entries on a trainer's payroll record.  On "one occasion" Sykes made the entries on the trainers' payroll records without Farino's approval, and Sykes then "refused to do so after that and reported it to human resources."

On March 12, 2013 Sykes met with Faulk and told her he "did not want to break the law and [he] did not want to commit fraud without her support."  Sykes informed Faulk "she was not giving [him] the support [he] needed" to do the operations administrator position.  Sykes made similar complaints to his supervisors at the West Hollywood club.  Sykes testified he "was forced to resign" from the operations administrator position because he did not want "to continue to break the law."  Although he "liked the job of operations administrator," Sykes returned full time to the front desk associate position.

4

C.     *Sykes Alleges Harassment and Retaliation*

While Sykes testified that Hands's harassment began on his first day at Equinox, Sykes contended the "majority" of Hands's harassment began in early March 2013.  Hands is "a gay male."  Sykes testified that Hands called him various "pet" names, including "sir," "mister," "cutie," and "rock star."  When Hands addressed Sykes with "sir" or "mister," Hands "usually followed with a statement or question," and Sykes "responded to any statements or questions he made to [him]."  Sykes believed the terms "sir" and "mister" convey a "sexual innuendo" in the gay community.  Hands called Sykes "cutie" a "few" times.  According to Sykes, the term "cutie" is a "form of flirting" in "every community."  Sykes heard Hands greet "other" employees by calling them "rock stars," but according to Sykes, "[w]hen he spoke to me, [rock star] was directed to me in a sexual manner."  Hands used the terms "sir," "mister," "cutie," and "rock star" when speaking to all types of Equinox employees regardless of their sex or sexual orientation.

Sykes further testified Hands once asked him if he was gay, but Sykes did not respond.  Other Equinox employees also asked Sykes if he was gay.  On two or three occasions, Hands also asked Sykes whether he had "fucked" certain male club members or if he wanted to "fuck" them.  Sykes did not respond.  On seven or eight occasions, Hands either told Sykes to stop flirting with male club members or asked Sykes whether he frequented gay bars.  Sykes did not respond.  An Equinox employee once asked Sykes "which half is [your] black half."  Sykes believed this comment was "referring to the size of [his] penis."  According to Sykes, Hands then made a "racial" comment, "[W]e'll have to catch him

5

in the locker room next time." Between one and five occasions, Hands made reference to Espinoza's and Avitia's breast implants.

On at least five occasions Hands hugged Sykes when giving him a "high five." Sykes observed Hands hug other Equinox employees. Sykes hugged Avitia, Espinoza, and other Equinox employees and club members. In his declaration, Hands stated, while at Equinox, he "hugged both men and women, straight and homosexual employees, and employees of all races and nationalities." On one occasion in April 2013, Hands patted Sykes on his hair saying it "felt like velcro"; Sykes asked Hands not to touch him. Also, in April 2013 Hands "patted [Sykes] on the behind like a baseball player and said, 'Go to work.'" Sykes testified that while he was working on a computer, Farino and another Equinox employee tried to show him a gay pornographic video involving an Equinox trainer, but Sykes did not watch it; he just heard the audio and the other employees discussing the video.

Sykes did not complain to his supervisors about the sexual harassment until after he left the operations administrator position in March 2013. On two occasions, Sykes reported to Espinoza Hands's unwanted hugs and touching and his use of pet names, but Hands's name calling and hugging continued. Sykes believed that he "was harassed because [he] would not comment on [his] sexuality to anybody." In February 2013, at Sykes's request, Hands sent Sykes his cell phone number. Shortly thereafter, Sykes texted Hands stating, "[H]ope we can be friends." Among other texts, on March 27, 2013 Sykes texted Hands wishing him "HAPPY BIRTHDAY."

6

D. *Equinox Writes Up Sykes Twice*

On April 29, 2013 Equinox issued Sykes his first written notification of deficient job performance (write-up) based on two grounds. First, while working as a front desk associate, Sykes received telephone calls from a member and a prospective member. In connection with the prospective member, Sykes failed to "communicate properly with management to assist when all advisors were busy." As to the member, Sykes did not "assist member with information on how to enter the facility." According to the write-up, Sykes did not "provide the customer service up to Equinox standards." Second, Sykes missed a day of work without authorization and "didn't find coverage for his shift." He also did not notify Equinox that he would be absent from work. Sykes signed the write-up without making any objections or comments and acknowledged that he had an opportunity to review the document before it was placed in his personnel file. Sykes testified, "The reason for the write-up was because I was being retaliated against."

On May 21, 2013 Equinox issued Sykes a second write-up labelled "Final." The write-up was based on Sykes's improper use of the executive locker room at the West Hollywood club. The write-up stated, "[Sykes] has been using and utilizing the Exec Locker Room at various times throughout the day. The only time when an employee is permitted to use this is when closing to ensure all members have left. Otherwise, it's entirely off limits." The write-up also stated, "Further corrective actions will be taken including termination." Sykes also signed this write-up without comment or objection. Although not in writing, Equinox's policy was "Front Desk Associates who are on closing shift should only enter the executive locker room at closing to

7

ensure that no members were still in the executive locker room when the club closed."

E. *Equinox Suspends Sykes, then Terminates His Employment*

On May 21, 2013, shortly after Sykes received the second write-up, Avitia, who hired Sykes, contacted Emerson Figueroa, Equinox's human resources manager, informing him that Sykes "had received a final warning that day for excessive entrances into the men's executive locker room; and she wanted to terminate" his employment. Later that day Sykes contacted John Strachan, Equinox's regional director, stating "he wanted to report a serious work related issue." On May 23, 2013 Sykes met with Figueroa and Strachan. Sykes explained the discrimination and harassment he experienced at Equinox, and his refusal to fraudulently change the trainers' payroll records. Sykes admitted to Figueroa and Strachan that he entered the executive locker room on five occasions for non-business "recreational purposes." At this meeting, Sykes complained for the first time that Equinox forced him to work off the clock. When Figueroa asked Sykes the number of hours he was not paid, Sykes "just threw him a number," stating six hours.[2]

At the conclusion of the meeting on May 23, 2013, Figueroa advised Sykes that Equinox was suspending him on a non-disciplinary basis with paid time off while Equinox investigated his complaints. Equinox's electronic records revealed that, between March 8, 2013 and May 21, 2013, Sykes had entered the

---

[2] Sykes had no records or recollection of his missed meal and rest breaks or of his uncompensated time. Equinox's payroll records showed that Sykes took all of his meal breaks.

West Hollywood club's executive locker room 131 times. At least nine of these entries were on days when Sykes was not working. Figueroa also reviewed the surveillance tapes, which supported his conclusions that Sykes improperly used the executive locker room in violation of Equinox's policy. Figueroa was unable to substantiate Sykes's discrimination and harassment claims. Consequently, on May 29, 2013 Equinox terminated Sykes's employment. Sykes's final paycheck included the six hours he claimed he worked off the clock. Sykes worked at the West Hollywood club for approximately four months.

F.     *Sykes Files This Action*

Sykes filed a complaint against Equinox on July 21, 2014, alleging 12 causes of action. Sykes alleged Equinox "instructed [him] to cleanse company records and time cards of wages paid and actual time worked by employees . . . to alter time cards to reflect that EQUINOX employees were taking meal and rest breaks in accordance with California law, even if they were not." Sykes alleged that, as an operations administrator, he "refused to alter time cards and falsify records, because he reasonably believed it was unlawful to do so." Sykes alleged that, in retaliation, "he was demoted," "returned to the front desk," and subjected to "a retaliatory campaign to discredit [him]." Sykes alleged that he complained to Equinox management about "the retaliatory conduct he was experiencing by management because he refused to falsify time cards."

In addition, Sykes alleged Hands "engaged in a campaign of racial discrimination and sexual harassment against [him]." The campaign consisted of Hands "inappropriately" hugging and touching Sykes, calling Sykes "various pet names," and making "stereotypical comments about black people." Sykes alleged he

9

"repeatedly asked [Hands] to stop touching [and] hugging him, but [Hands's] sexually harassing behavior continued." Sykes alleged Equinox "regularly edited [his] time cards to reflect that he was taking lawful meal and rest breaks, when in reality he was denied lawful meal and rest breaks." Finally, Sykes alleged that Equinox retaliated and discriminated against him by wrongfully terminating his employment "under pretext" on May 29, 2013.

Based on these allegations, Sykes alleged causes of action for racial discrimination in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.); discrimination based on sexual orientation in violation of FEHA; sexual harassment in violation of FEHA; retaliation based on participation in protected activity in violation of FEHA; failure to take all reasonable steps to prevent discrimination, harassment and retaliation in violation of FEHA; failure to pay wages pursuant to Labor Code sections 1194 and 1197; waiting time continuation violations under Labor Code sections 201 through 203; failure to provide accurate itemized statements pursuant to Labor Code section 226; failure to provide meal and rest break periods in violation of Labor Code section 226.7 and Wage Order No. 16-2001 (11-12); unfair competition pursuant to Business & Professions Code section 17200 et seq.; violation of Labor Code sections 98.6 and 1102.5 (unlawful retaliation); and wrongful termination in violation of public policy. Sykes also sought punitive damages.

G. *The Trial Court Schedules the Hearing on Equinox's Summary Judgment Motion Before Trial*

On February 4, 2016 the trial court scheduled trial for October 17, 2016. On June 17, 2016 Equinox filed an ex parte

10

application seeking to specially set its anticipated motion for summary judgment because there were no available hearing dates before the trial date. The trial court denied Equinox's ex parte application, stating, however, it would hear the motion if it was timely filed.

On July 1, 2016 Equinox filed and personally served a motion for summary judgment, or in the alternative, for summary adjudication with a hearing date of February 1, 2017, the earliest hearing date it could reserve. On August 11, 2016 Equinox filed an ex parte application seeking to continue the trial date to permit its summary judgment motion to be heard. In its ex parte application, Equinox also sought to continue all pretrial dates other than the cut-off for non-expert discovery. Sykes opposed Equinox's application, maintaining that he was "only amenable to continuing trial and all related dates if non-expert discovery is also continued."

The trial court denied Equinox's application finding "[n]o good cause for a trial continuance is shown." However, the trial court advanced the hearing date for Equinox's motion from February 1, 2017 to September 21, 2016. The trial court also found good cause for the motion to be heard less than 30 days prior to trial. In doing so, the trial court noted, "this case has been pending for over two years, and there has been more than enough time to complete discovery." The trial court's advancement of the hearing provided Sykes with 82 days' notice from the date of personal service (July 1, 2016) to the September 21, 2016 hearing date.

H.     *Sykes Seeks To Strike or Continue Equinox's Motion*

On August 19, 2016 Sykes filed an ex parte application seeking to "strike" Equinox's motion for summary judgment or "to

11

continue the [motion] and trial." Sykes argued that because the trial court advanced the motion's hearing date from February 1, 2017 to September 21, 2016, he was only given "40 days notice," and he was "entitled to mandatory 75 days notice." Sykes also argued that he needed the relief so he can finish his "discovery to adequately oppose the motion." Sykes listed two Equinox witnesses (Avitia and Farino) he "noticed" to depose. However, Sykes failed to state any specific information he needed to oppose Equinox's motion for summary judgment, who possessed the information, or why he delayed in taking the discovery. Equinox opposed the ex parte asserting that Sykes was given more than the mandatory 75 days' notice from the motion's service date (July 1, 2016) to the September 16, 2016 hearing date. Equinox also stated, "Plaintiff's counsel have had over 2 years to conduct discovery or file any necessary motions to compel." The trial court denied Sykes's ex parte application finding, "The Motion for Summary Judgment was filed and served with proper notice for hearing on 9/21/16."

On August 24, 2016, Sykes filed a second ex parte application to strike Equinox's summary judgment or to continue the trial, providing the same reasons as his prior application. The trial court also denied this application.

Citing Code of Civil Procedure[3] section 437c, subdivision (h), on August 29, 2016 Sykes filed a third ex parte application "for reconsideration" seeking to strike the summary judgment motion or to continue the motion and trial. In support, Sykes listed the two Equinox witnesses he sought to depose and asserted he did not receive proper statutory notice because the

_____

[3]     Further undesignated statutory references are to the Code of Civil Procedure.

12

trial court advanced the motion's hearing date. However, Sykes did not set forth any information he required to oppose the motion for summary judgment, or why he delayed in seeking the two depositions. Sykes also argued that "it is mandatory that plaintiff(s) receive at least 75 days of notice and this requirement **cannot** be shortened by the Court's discretion."

The trial court denied Sykes's application, ruling "Plaintiff apparently is confused as to how the 75 day notice period is calculated on a MSJ. It does not begin on the date the clerk found and the court offered (on ex parte) an earlier hearing date prior to trial. Instead, the notice period begins on the date when the motion is first filed and served, in this case on July 1, 2016. The hearing date is now set for a date that provides more than 75 days notice. In addition, it is within this court's discretion to hear the motion within 30 days of trial, which is here necessitated due to court congestion."

On August 31, 2016 Sykes filed in this court a petition for writ of mandate seeking to "either strike . . . or, to continue" Equinox's motion because he "was only given 40 days notice of the hearing for the motion (rather than the *mandatory* 75 day notice per *C.C.P.* 437c(a))." This court summarily denied the petition on September 2, 2016.

 I. *Equinox's Summary Judgment/Adjudication Motion*

  1. *Equinox's Moving Papers*

Equinox argued there was no evidence that Sykes was subjected to an adverse employment action because of his race or sexual orientation, and Equinox "had legitimate business reasons for the actual adverse employment actions it took." As to his sexual harassment cause of action, Equinox argued that Sykes could not prove that any objectionable conduct was motivated by

13

his sex (male) or sexual orientation, and the alleged sexual harassment was "neither severe nor pervasive." Regarding Sykes's claims for retaliation, Equinox contended the undisputed evidence showed "there were legitimate reasons" for any adverse employment actions, and "there is no evidence to establish a causal link between any of [his] complaints and his two write-ups or his termination."

Equinox argued Sykes could not prevail on his causes of action for unpaid wages, missed meal and rest periods, and waiting-time penalties because Sykes had no supporting records, and he could not otherwise substantiate the claims. Equinox also paid Sykes for the six hours he claimed as uncompensated time. Equinox argued that, because Sykes's other claims fail, the trial court should grant summary adjudication on Sykes's cause of action for violation of Business & Professions Code section 17200. Finally, Equinox argued Sykes could not recover punitive damages because Sykes's "allegations fall short of establishing 'clear and convincing' evidence of oppression, fraud or malice."

### 2. *Sykes's Opposition*

Sykes argued there were disputed issues of fact concerning whether Equinox discriminated against him because "[he] put forward substantial and credible evidence that adverse employment action was taken against him by continuously being sexually harassed by Mr. Hands when [Sykes] objected to the race, sex, and sexual orientation discrimination and harassment, and by Mr. Hands altering Plaintiff's time cards, and issuing retaliatory write ups against Mr. Sykes, among other conduct." Sykes further contended triable issues existed whether his "termination was motivated by discriminatory and/or retaliatory animus" because "Equinox has failed to establish that it

14

terminated Plaintiff for (1) poor work performance and (2) excessive use of the executive locker room." Sykes also contended that, when he complained to management at the May 23, 2013 meeting, "he was suspended and terminated only six days later."

Further, Sykes argued triable issues existed concerning whether Equinox racially and sexually harassed him because he was subject to Hands's "intimidating, hostile, and abusive" conduct, which was "also both severe and/or pervasive, because it occurred regularly, involved physically threatening and humiliating conduct, and unreasonably interfered with Sykes' work performance." Sykes argued there were triable issues of fact regarding his claims for retaliation because Hands reduced his hours and altered his time records after Sykes refused "to engage in unlawful conduct," and Equinox issued "retaliatory and unfounded disciplinary warnings." Sykes also argued he established triable issues as to whether he received all his wages, compensation, and itemized wage statements. "Mr. Sykes testified that Defendant's management instructed him to work off-the-clock and during his meal and rest periods, and that Manager Hands deducted time from Mr. Sykes's timesheet."[4]

Sykes also filed a document labelled "Objection to Summary Judgment and Request to Strike Summary Judgment, or in the Alternative Continue It." In that document, Sykes set forth the history of his attempts to strike and to continue Equinox's summary judgment motion. Without submitting a

---

[4] Sykes did not file any objections to Equinox's evidence submitted in support of its summary judgment motion. Along with its reply papers, Equinox filed evidentiary objections to Sykes's evidence.

15

supporting declaration, Sykes asserted he "will be seriously prejudiced" because he "has noticed multiple depositions." Sykes did not seek relief under section 437c, subdivision (h).

J.       *The Trial Court Denies Sykes's Request To File "Supplemental Items"*

After receiving the trial court's tentative ruling granting Equinox's motion, Sykes filed an ex parte application stating "we mistakenly failed to include adequate evidence, or argument, supporting Plaintiff's claims for punitive damages, retaliation, sexual harassment, and discriminatory animus." As a result, Sykes requested that the court allow him to file "supplemental items," including further excerpts of deposition transcripts, an Equinox discovery response, a supplemental statement of disputed and undisputed facts, and a supplemental brief. According to Sykes, "The entirety of the additional evidence sought to be supplemented are discovery responses and/or deposition testimonies of Defendant Equinox and its employees and agents." The "supplemented items" were in existence when Sykes filed his opposition papers to the motion.

On September 27, 2016 the trial court denied Sykes's ex parte application finding, "There is no authority or good cause to allow Plaintiff to submit new evidence in opposition to Defendant's motion for summary adjudication/judgment. The Court has on September 21, 2016, already issued a tentative ruling, ruled on evidentiary objections, and, because the Court was in trial, continued the hearing to September 28, 2016, to hear arguments from both sides. The hearing was not continued to allow further submissions of evidence or argument. [¶] Plaintiff's opposition papers to the MSJ/MSA were filed on September 7, 2016. Plaintiff had ample opportunity to submit

16

affidavits, declarations, discovery responses, and the like to support his opposition to this motion before the hearing on September 21, 2016. The hearing was set for September 21, 2016, and proceeded on that date. The court further notes that this case has been pending for more than two years. [¶] Defendant objects to this ex parte on the grounds that the relief sought would be prejudicial to defendant. The Court agrees. The rules regarding briefing and submission of supporting documents on a motion for summary judgment provide for fairness and due process to all parties."

K.     *The Trial Court's Rulings*

After finding that Equinox carried its initial burden, the trial court ruled that Sykes had failed to show the existence of any triable issue of fact, and granted Equinox's motion for summary judgment. As to Sykes's causes of action for racial and sexual orientation discrimination, the trial court concluded Sykes had failed to present sufficient evidence to establish triable issues of fact regarding whether racial or sexual orientation "played a substantial role" in Equinox's decision to terminate his employment. The trial court ruled the "sporadic and isolated incidents of racially motivated conduct" and "[m]inor or relatively trivial adverse actions" did not constitute discrimination. The court further ruled Equinox established that Sykes was not performing adequately in his position as a front desk associate. The court also ruled Sykes had not shown any evidence that the incidents underlying Sykes's cause of action for harassment were directed at him because he was bisexual or that the incidents were sufficiently intolerable or aggravated. Therefore, the trial court granted Equinox summary adjudication on Sykes's cause of action for sexual harassment.

17

Finding no evidence that Sykes engaged in protected activities, and no connection between any alleged protected conduct and Equinox's decision to terminate Sykes's employment, the trial court granted summary adjudication on Sykes's causes of action for retaliation. Regarding Sykes's claims for failure to pay wages and waiting-time penalties, the trial court found that Equinox paid Sykes for the six hours he requested at the May 23, 2013 meeting, and Sykes never asked for any further compensation. The trial court ruled that, because Sykes did not know when he took meal or rest breaks, "by his own testimony [Sykes] is unable to establish that he was not provided meal and/or rest breaks." The trial court ruled the one-year statute of limitations in section 340, subdivision (a), barred Sykes's claim for inaccurate wage statements. The trial court found Sykes's unfair competition cause of action lacked merit because there were no underlying violations of law, and Sykes "failed to carry [his] burden" to produce "sufficient evidence . . . to support a claim for punitive damages." Finally, the trial court sustained most of Equinox's objections to Sykes's evidence.

On November 15, 2016 the trial court entered judgment against Sykes. Sykes timely appealed.

## DISCUSSION

A. *The Trial Court Did Not Err in Scheduling and Declining To Continue Equinox's Motion for Summary Judgment*

1. *The Trial Court Did Not Deprive Sykes of Statutory Notice by Advancing the Hearing*

Sykes's first argument is that he did not receive the required 75 days' notice of Equinox's motion for summary judgment. Sykes is wrong. When the trial court advanced the

18

motion's hearing date to September 21, 2016, it ruled, "The hearing date is now set for a date that provides more than 75 days notice." The trial court ruled that "the notice period begins on the date when the motion is first filed and served, in this case on July 1, 2016." Sykes contends "that the trial court erred, and that the notice period starts from August 11, 2016, when Sykes was notified that the Motion for Summary Judgment would be heard on September 21, 2016." Sykes, however, does not cite any pertinent legal authority in support of his argument. Therefore, Sykes forfeited the argument. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*) ["'[t]he absence of cogent legal argument or citation to authority allows this court to treat the contention as waived'"]; accord, *Potter v. Alliance United Ins. Co.* (2019) 37 Cal.App.5th 894, 911.)

Even if considered, Sykes's argument is contrary to the plain language of the pertinent Code of Civil Procedure sections. Because the adequacy of service of a motion involves statutory construction, we review the issue de novo. (See *Boyer v. County of Ventura* (2019) 33 Cal.App.5th 49, 53; *Vergara v. State of California* (2016) 246 Cal.App.4th 619, 642.)

Section 437c, subdivision (a)(2), provides, "Notice of the motion and supporting papers shall be served on all other parties to the action at least 75 days before the time appointed for hearing." Section 12c, subdivision (a), provides, "Where any law requires an act to be performed no later than a specified number of days before a hearing date, the last day to perform that act shall be determined by counting backward from the hearing date, excluding the day of the hearing as provided by Section 12."

Equinox personally served Sykes with the motion papers on July 1, 2016, and the trial court set the hearing for September 21,

19

2016.  September 21, 2016 is therefore "the time appointed for hearing" under section 437c, subdivision (a)(2).  Counting backward from the September 21, 2016 hearing date to the date on which Sykes was personally served, Sykes received 82 days' notice.  Sykes therefore received sufficient notice under section 437c, subdivision (a)(2).  The trial court did not impermissibly "shorten the time for the 75-day notice of a Summary Judgment hearing" as Sykes argues.[5]

> 2.  *The Trial Court Did Not Abuse its Discretion in Denying Sykes's Requests To Continue or Strike Equinox's Motion*

Section 437c, subdivision (h), provides:  "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication, or both, that facts essential to justify opposition may exist but cannot, for reasons stated, be presented, the court shall deny the motion, order a continuance to permit affidavits to be obtained or discovery to be had, or make any other order as may be just."  The statute requires the court to continue a summary judgment hearing when a party makes a good faith showing by affidavit that additional time is needed to obtain facts essential to oppose the motion.  (*Johnson v. Alameda County Medical Center* (2012) 205 Cal.App.4th 521, 532 (*Johnson*); *Yuzon v. Collins* (2004) 116 Cal.App.4th 149, 167; *Dee v. Vintage Petroleum, Inc.* (2003) 106 Cal.App.4th 30, 34 (*Dee*).)  Continuance of a summary judgment hearing is not mandatory

---

[5]     Sykes properly raised the trial court's advancement of the hearing date and the shortening of his time to file opposition papers as factors for the trial court to consider in connection with his requests to continue the hearing.

when the party does not submit an affidavit or when the submitted affidavit fails to make the necessary showing under section 437c, subdivision (h). (*Johnson*, at p. 532; *Frazee v. Seely* (2002) 95 Cal.App.4th 627, 633-634; see also *California Automobile Ins. Co. v. Hogan* (2003) 112 Cal.App.4th 1292, 1305-1306.) Thus, in the absence of an affidavit that requires a continuance under section 437c, subdivision (h), we review the trial court's denial of appellant's request for a continuance for abuse of discretion. (*Denton v. City and County of San Francisco* (2017) 16 Cal.App.5th 779, 794; *FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 72.)

A declaration in support of a request for continuance under section 437c, subdivision (h), must show: "(1) the facts to be obtained are essential to opposing the motion; (2) there is reason to believe such facts may exist; and (3) the reasons why additional time is needed to obtain these facts." (*Wachs v. Curry* (1993) 13 Cal.App.4th 616, 623; accord, *Johnson, supra*, 205 Cal.App.4th at p. 532.) "'The purpose of the affidavit required by Code of Civil Procedure section 437c, subdivision (h) is to inform the court of outstanding discovery which is necessary to resist the summary judgment motion." (*Bahl v. Bank of America* (2001) 89 Cal.App.4th 389, 397.) It is not sufficient under the statute merely to indicate further discovery or investigation is contemplated. The statute makes it a condition that the party moving for a continuance show "'facts essential to justify opposition may exist.'" (*Granadino v. Wells Fargo Bank, N.A.* (2015) 236 Cal.App.4th 411, 420 (*Granadino*); *Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 548.)

In his three ex parte applications and in the objections filed with his opposition, Sykes stated that the depositions of two

Equinox witnesses he had noticed did not go forward for various reasons. He also stated that his time to take discovery was curtailed by the trial court's advancement of the summary judgment hearing. Sykes, however, failed to satisfy any of the section 437c, subdivision (h), requirements. Sykes failed to identify "essential" facts to be obtained from the Equinox witnesses he sought to depose and the reasons he believed those facts existed. He also failed to explain why he did not take the depositions of known Equinox witnesses in the two years the action had been pending.[6]

Under these circumstances, Sykes has not shown that the trial court abused its discretion in denying Sykes's applications. (See *Cooksey v. Alexakis* (2004) 123 Cal.App.4th 246, 255 ["Mr. Monroy's second declaration, like his initial one, failed to explain how the outstanding discovery was necessary for appellant's opposition. Based on this deficiency alone, the trial court had the discretion to deny appellant's request for a continuance, and such a denial was not an abuse of discretion"]; *Granadino, supra,* 236 Cal.App.4th at p. 420 [request for continuance was properly denied where the "declaration simply concluded that 'additional information and testimony is still required in order to adequately respond to Defendant's motion'"].)

---

[6]    In his ex parte applications, Sykes referred to two depositions he noticed, Avitia and Farino. Sykes's objections to Equinox's summary judgment motion referred only to "additional depositions." However, without citing to the record, Sykes states in his opening brief he noticed "four deponents."

22

3. *The Trial Court Did Not Abuse its Discretion in Denying Sykes's Request To File "Supplemental Items"*

After appearing in court on the original hearing date for Equinox's motion for summary judgment and receiving the trial court's adverse tentative ruling, Sykes filed an application "to file supplemental briefings." Finding that the relief Sykes was seeking was "prejudicial" to Equinox and that Sykes had "ample opportunity to submit" opposition papers, the trial court denied Sykes's application. Sykes argues that the trial court abused its discretion in denying his "application to file supplemental briefings." Again, Sykes does not cite pertinent legal authority in support of this argument, and he has therefore forfeited the argument. (*Cahill, supra,* 194 Cal.App.4th at p. 956.)

Even if he had not forfeited the argument, Sykes failed in the trial court to explain how the supplemental evidence could have impacted the adjudication of the summary judgment motion. Other than apologizing to the trial court and Equinox for "mistakes" in compiling the opposition papers, Sykes did not explain why the "supplemental items" were not filed with his opposition. Sykes also did not explain why he should have been permitted to file a supplemental brief to address the trial court's tentative ruling. Here, Sykes argues, had the trial court "not denied Sykes' the opportunity to provide a supplemental brief, Sykes' [*sic*] claims would have survived a motion for Summary Judgment." Sykes failed to explain why he would have survived summary judgment.

Accordingly, even if Sykes's argument is considered, Sykes failed to demonstrate that the trial court abused its discretion. (See *Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 765 ["We review the trial court's refusal to consider plaintiff's

23

'surrebuttal' brief for an abuse of discretion.  A trial court has broad discretion under rule 3.1300(d) of the California Rules of Court to refuse to consider papers served and filed beyond the deadline without a prior court order finding good cause for late submission"].)

B.  *Standard of Review on Summary Judgment*

A motion for summary judgment or summary adjudication is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).)  We review a grant of summary judgment or summary adjudication de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party or a determination a cause of action has no merit as a matter of law.  (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286; *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618 (*Schachter*); *Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 582 (*Soria*).)  The evidence must be viewed in the light most favorable to the nonmoving party.  (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 703 (*Ennabe*); *Schachter*, at p. 618.)

When a defendant moves for summary judgment in a situation in which the plaintiff would have the burden of proof at trial by a preponderance of the evidence, the defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action.  Alternatively, the defendant may present evidence to "'show[ ] that one or more elements of the cause of action . . . cannot be established' by the plaintiff." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 (*Aguilar*); see § 437c, subd. (p)(2).)  ""'"The moving party bears the

24

burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish,'" the elements of his or her cause of action."'" (*Ennabe, supra,* 58 Cal.4th at p. 705; accord, *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720; *Soria, supra,* 5 Cal.App.5th at p. 582.)

Once the defendant's initial burden has been met, the burden shifts to the plaintiff to demonstrate, by reference to specific facts, not just allegations in the pleadings, there is a triable issue of material fact as to the cause of action. (§ 437c, subd. (p)(2); *Aguilar, supra,* 25 Cal.4th at p. 850.) On appeal from an order granting summary judgment, "a reviewing court must examine the evidence de novo and *should draw reasonable inferences* in favor of the nonmoving party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 470 (*Miller*); accord, *Aguilar*, at p. 843.) "[S]ummary judgment cannot be granted when the facts are susceptible of more than one reasonable inference . . . ." (*Rosas v. BASF Corp.* (2015) 236 Cal.App.4th 1378, 1392; accord, *Soria, supra,* 5 Cal.App.5th at p. 582.)[7]

> C. *Sykes Failed To Raise a Triable Issue of Fact on His Cause of Action for Discrimination Based on Sexual Orientation*
>
> 1. *The McDonnell Douglas Burden-shifting Test*
>
> FEHA prohibits an employer from, among other things,

---

[7] Sykes argues the trial court erred in granting summary adjudication on his claims for discrimination based on sexual orientation, sexual harassment, retaliation in violation of FEHA and Labor Code, wrongful termination, failure to maintain a work environment free from discrimination and harassment, and punitive damages.

discharging a person from employment because of his or her gender, gender identity, gender expression, or sexual orientation. (Gov. Code § 12940, subd. (a).)  In analyzing claims of discrimination under FEHA, California courts have long used the three-stage, burden-shifting approach established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*) for the analysis of title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) employment discrimination claims.  (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2 (*Reid*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*) ["[b]ecause of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes"].)  The *McDonnell Douglas* test "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially.  Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz,* at p. 354; accord, *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860 (*Serri*).)

Under the *McDonnell Douglas* test, a plaintiff may establish a prima facie case for unlawful discrimination by providing evidence that "(1) he [or she] was a member of a protected class, (2) he [or she] was qualified for the position he [or she] sought or was performing competently in the position he [or she] held, (3) he [or she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra,* 24 Cal.4th at p. 355; *Soria, supra,* 5 Cal.App.5th at

26

pp. 583-584.) "Once the employee satisfies this burden, there is a presumption of discrimination, and the burden then shifts to the employer to show that its action was motivated by legitimate, nondiscriminatory reasons. [Citation.] A reason is "'legitimate'" if it is 'facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination.' [Citation.] If the employer meets this burden, the employee then must show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination." (*Reid*, *supra,* 50 Cal.4th at p. 520, fn. 2, italics omitted.)

"[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz, supra,* 24 Cal.4th at p. 361; see also *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1097-1098 [if a defendant employer's motion for summary judgment "relies in whole or in part on a showing of nondiscriminatory reasons for the [adverse employment action], the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the [adverse action]. [Citations.] To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred"].) "'Circumstantial evidence of "'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate" on an improper basis.'" (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 834.)

### 2. *Equinox Carried Its Burden, and Sykes Failed To Raise a Triable Issue*

The parties agree that Sykes, a bisexual male, is a member of a protected class under FEHA, and that, because his employment was terminated, he suffered an adverse employment action. However, Equinox argues Sykes failed to establish two elements of a prima facie case for discrimination. First, based on Sykes's two write-ups, Equinox argues "Sykes failed to demonstrate that he was performing satisfactorily at the time of his termination." Second, Equinox argues "Sykes produced no evidence of a causal connection between his protected status and his termination." Sykes argues he established triable issues of fact concerning whether he was satisfactorily performing his job duties and whether his "termination was sexually discriminatory."

We need not address these arguments in the context of whether Sykes established a prima facie case of discrimination. In its summary judgment motion, as an additional basis for its motion, Equinox proceeded to be second step of the *McDonnell Douglas* framework. Thus, assuming, without deciding, Sykes established a prima facie case of discrimination based on sexual orientation, Equinox identified "legitimate, nondiscriminatory reasons" for Sykes's discharge. In response, Sykes failed to come forward with "specific and substantial evidence" to create a triable issue of fact regarding whether these legitimate reasons were pretextual. Accordingly, the trial court correctly granted summary adjudication on Sykes's cause of action for discrimination based on sexual orientation.

28

### a. *Equinox established legitimate nondiscriminatory reasons*

To carry its burden, Equinox relies on the two write-ups and Figueroa's investigation, which revealed the extent of Sykes's improper use of the executive locker room.[8] The two write-ups, which Sykes signed without objection, document that Sykes missed work without arranging for coverage or giving advance notice, inappropriately interacted with a club member and a prospective club member, and improperly used the executive locker room. Equinox's electronic records support its conclusion that Sykes improperly used the executive locker room in violation of Equinox's policy. Indeed, Sykes admitted he entered the executive locker room for "recreational purposes" unrelated to his work duties.

As Equinox argues, there is no evidence that the Equinox managers, Avitia, Strachan, and Figueroa, who made the decision to discharge Sykes, based their decision to terminate Sykes on a discriminatory motive, harbored any discriminatory intent, or made any discriminatory remarks about Sykes or anyone.[9] (See *McGrory v. Applied Signal Technology, Inc.* (2013)

---

[8] Figueroa's investigation also disclosed that "there were multiple complaints about [Sykes's] unprofessional behavior, conduct, and lack of communication skills" and Sykes "was rude to co-workers and members alike, a gossip-monger who socialized with co-workers when he should have been working, and created an uncomfortable work environment."

[9] While not creating a "'strong inference,'" as Equinox argues, the "same actor" evidence, that Avitia hired Sykes and requested his termination several months later, is consistent with Equinox's nondiscriminatory legitimate reasons for Sykes's

29

212 Cal.App.4th 1510, 1534 (*McGrory*) ["Employee has presented no such evidence of derogatory, pejorative, or demeaning statements reflecting antipathy towards males by those directly involved in the decision to terminate Employee or by anyone who influenced the decision makers"].) Hands was not involved in the decision to discharge Sykes or the two write-ups. (See *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 231 [FEHA "does not purport to outlaw discriminatory thoughts, beliefs, or stray remarks that are unconnected to employment decision making"].)

Equinox put forward adequate evidence supporting legitimate and nondiscriminatory reasons for Sykes's termination, which are facially unrelated to any prohibited bias. Thus, Equinox presented evidence of nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for Sykes's termination. "At that point the presumption of unlawful discrimination 'simply drops out of the picture.'" (*Horn, supra,* 72 Cal.App.4th at p. 807; accord, *McGrory, supra,* 212 Cal.App.4th at p. 1529 ["In reviewing

_____

discharge. (See *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 809 (*Horn*) ["'where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive'"].) According to this theory, "'"[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."'" (*Ibid.*) However, "the same-actor inference has lost some of its persuasive appeal in recent years." (See *Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1188 (*Husman*).) Sykes did not respond to Equinox's "same-actor" argument.

Employer's showing, we are not concerned with the wisdom of the termination, just with whether Employer has proffered nondiscriminatory reasons"].)

Under the *McDonnell Douglas* analysis, the burden therefore shifted to Sykes to "show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination." (*Husman, supra,* 12 Cal.App.5th at p. 1181.)

> b. *Sykes failed to show discriminatory intent*

"[A]n employer does not require good cause to terminate an at-will employee . . . ." (*McGrory, supra,* 212 Cal.App.4th at p. 1533.) "'The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344 (*Arteaga*).) Further, "no inference of discrimination can reasonably be drawn from the mere lack of conclusive evidence of misconduct by the employee." (*McGrory,* at p. 1533.) However, a plaintiff employee may establish pretext by showing ""'the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge."'" (*Soria, supra,* 5 Cal.App.5th at p. 594; accord, *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 224; see also *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 (*Hersant*).) While "[p]roof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons[,] . . . there must be evidence supporting a rational inference that *intentional discrimination, on grounds*

31

*prohibited by the statute, was the true cause* of the employer's actions." (*Guz, supra,* 24 Cal.4th at p. 361.) Sykes attempts to show pretext in two ways. First, Sykes argues that he was "bogusly written up" because the two write-ups "were fabricated." Second, Sykes argues that the temporal proximity between his complaints to management on May 23, 2013 and his termination several days later establishes pretext. However, neither argument creates a triable issue of fact regarding pretext.

            i.     *Sykes failed to establish the two write-ups were a pretext for discrimination*

Sykes's argument that "[t]he validity of, and the reasons for, the two write-ups are material disputed questions of fact," misses the mark. "It is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound . . . . [¶] 'The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. [Citations.] Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [the asserted] non-discriminatory reasons."'" (*Hersant, supra,* 57 Cal.App.4th at p. 1005.) Simply showing the employer was lying, without some evidence of discriminatory motive, is not enough to infer discriminatory animus. "The pertinent [FEHA] statutes do not prohibit lying, they prohibit discrimination." (*Guz, supra,* 24 Cal.4th at p. 361; see *ibid.* ["there must be

32

evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions"].)  Under this standard, Sykes's attempts to discredit the write-ups fail because Equinox presented factual foundations for the write-ups, and Sykes failed to offer evidence of a discriminatory intent.

Regarding the deficient customer service documented in his first write-up, Sykes testified "this write-up is not true" because he provided appropriate customer service.  However, disputing Equinox's evaluation of his performance with his "'subjective personal judgments of [his] competence alone'" does not establish pretext.  (See *Mackey v. Trustees of California State University* (2019) 31 Cal.App.5th 640, 672, fn. 22; *Horn, supra,* 72 Cal.App.4th at p. 816 ["an employee's subjective personal judgments of [his] competence alone do not raise a genuine issue of material fact"]; *Bradley v. Harcourt, Brace & Co.* (9th Cir. 1996) 104 F.3d 267, 270 [same].)

As to the second part of the first write-up, the unexcused work absence, Sykes argues that he "presented corroborating evidence that he in fact found shift coverage and provided Equinox with a doctor's note excusing him from work from April 25th-27th."  Sykes further argues "Human Resources director Emerson Figueroa also gave sworn testimony that he did have the doctor's note Sykes provided that excused him from work."  Sykes's arguments are not supported by the record.

As to the purported doctor's note, the trial court sustained Equinox's evidentiary objections to the document, and Sykes has not challenged its exclusion.  Sykes has therefore forfeited any argument based on the alleged doctor's note.  (*Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 296, fn. 7 (*Aptos*

33

*Council*) ["[i]ssues not raised in the appellant's opening brief are deemed waived or abandoned"]; *Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 63 (*Altavion*).) Regarding Figueroa's "sworn testimony," Figueroa mentioned a doctor's note in his testimony, but denied that there was a doctor's note that excused Sykes missing work on the day in question. Sykes's citation to his deposition testimony that he "in fact found shift coverage," is ambiguous as to what day he obtained coverage. Under these circumstances, Sykes has not shown that Equinox "has given shifting, contradictory, implausible, uninformed, or factually baseless justifications" in the first write-up. (*Guz, supra,* 24 Cal.4th at p. 363; accord, *Horn, supra,* 72 Cal.App.4th at p. 817 [the plaintiff "'"must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses"'"].)

Sykes fares no better in challenging the second write-up. Equinox established that there was a policy regarding employee use of the executive locker room, which Sykes materially violated. Sykes signed, without protest, his second and final write-up, which stated, "The only time when an employee is permitted to use this is when closing to ensure all members have left. Otherwise, it's entirely off limits." Sykes argues, "Equinox had no policy in effect with respect to use of the executive locker room while Plaintiff was employed by Equinox." But he cites no evidence to support this statement. Sykes therefore forfeited this argument. (See *Centex Homes v. St. Paul Fire & Marine Ins. Co.* (2018) 19 Cal.App.5th 789, 796-797 (*Centex Homes*) [reviewing court may treat argument as forfeited when appellant fails to provide record citations supporting his or her contentions].) Sykes does not cite authority that an employer's policy must be in

34

writing to be effective. (See *E.E.O.C. v. Con-Way Freight, Inc.* (8th Cir. 2010) 622 F.3d 933, 936-937 ["[t]he plaintiffs argue that a reasonable jury could conclude that the policy did not exist because it was not in writing, but they do not cite any legal authority for the proposition that a policy must be in writing to be effective"].)[10]

It is undisputed that Sykes entered the executive locker room on 131 occasions between March 8 and May 21, 2013; at least nine were on Sykes's days off work. Indeed, Equinox's contemporaneous electronic records document the 131 instances with the time of entry. And Sykes, far from disputing the records, testified, "I don't know anything about the printout." Most of Sykes's entrances into the executive locker room were not in the evening at the gym's closing; some occurred in the morning and many others throughout the day. Thus, Sykes's testimony, "there were times I had to go four or five times in one evening when I was closing the gym," even if true, does not change the fact that Sykes had numerous improper entries into the locker room. Sykes further argues he entered the executive locker room "to carry out his job duties" because he "restocked the executive locker room with supplies such as towels, razors, and beverages when supplies were low and when members asked for it, even

---

[10]    Equinox disciplined a member advisor because he, on four occasions, entered the executive locker room for personal reasons. Because there is no evidence of this employee's discipline history, there is no basis to compare his treatment to Sykes's termination. (See *McGrory, supra,* 212 Cal.App.4th at p. 1536 ["[n]o inference of discrimination reasonably arises when an employer has treated differently different kinds of misconduct by employees holding different positions"].)

assisting members with their lockers." The argument is not supported by his record citation, and is therefore forfeited. (See *Centex Homes, supra,* 19 Cal.App.5th at pp. 796-797.)[11] Further, Sykes did not testify that these tasks were part of his duties as a front desk associate. As to why he entered the executive locker room on his days off work, Sykes testified, "I wash my hands a lot. That's why." Sykes thus confirms violations of Equinox's policy regarding entry to the executive locker room.[12]

    As with the first write-up, Sykes has not shown that the second write-up lacked any basis in fact or was otherwise "'unworthy of credence.'" (*Hersant, supra*, 57 Cal.App.4th at p. 1005.) Sykes supplied no admissible evidence from which a trier of fact could infer Equinox's proffered reasons for terminating his employment–his performance deficiencies and

---

[11]    Sykes, to support this argument, and also repeatedly throughout his opening brief, quotes an email dated May 21, 2013 from Avitia to Figueroa in which Avitia explained why Sykes was given access to the executive locker room. However, the trial court sustained Equinox's evidentiary objections to this document. Sykes has not challenged the ruling and forfeited any argument based on the email. (*Aptos Council, supra,* 10 Cal.App.5th at 296, fn. 7.) Even if considered, the May 21, 2013 email stated why Sykes could enter the executive locker room at the gym's closing; not numerous times throughout the day and also not on his days off work.

[12]    Sykes's arguments that Figueroa "did not review all of the surveillance footage of Sykes entering and exiting the executive locker room" and Equinox did not produce all the surveillance videos in discovery are made without citation to the record. Therefore, the arguments are forfeited. (See *Centex Homes, supra,* 19 Cal.App.5th at pp. 796-797.)

improper use of the executive locker room—were pretext for discrimination based on his sexual orientation. (See *Guz, supra,* 24 Cal.4th at p. 362 [summary judgment is proper when "given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred"].)

ii.    *Sykes failed to establish pretext based on temporal proximity*

Sykes also relies on the temporal proximity of the May 23, 2013 meeting at which he "lodged a formal complaint with Human Resources" and Equinox's decision to terminate his employment on May 28, 2013 to establish a "fabricated pretext." The factual record negates Sykes's temporal proximity argument; it is undisputed that, on May 21, 2013, after Avitia gave Sykes his second and "final" write-up, she communicated to Figueroa, Equinox's human resources manager, that "she wanted to terminate" his employment. After receiving this write-up mentioning his "termination," Sykes asked to meet with Strachan, Equinox's regional director. On May 23, 2013 Sykes met with Figueroa and Strachan, and he voiced his complaints about the alleged sexual harassment, failure to pay him for all his hours, and his refusal to engage in unlawful activities. After Figueroa's investigation confirmed the bases for Sykes's dismissal, Figueroa and Strachan terminated Sykes on May 29, 2013. Under these circumstances, because Avitia, the general manager at the West Hollywood club, had already indicated that "she wanted to terminate [Sykes]" before Sykes met with Figueroa and Strachan on May 23, 2013, Sykes's timing

37

argument is not supported by the record. Figueroa's later investigation confirmed the bases for Sykes's termination.[13]

Even if there were a factual basis for Sykes's timing argument, without evidence suggesting a discriminatory intent, his "temporal proximity" argument cannot create a triable issue of fact sufficient to defeat summary judgment. (*Arteaga, supra,* 163 Cal.App.4th at p. 353 ["'[s]tanding alone against Defendant's strongly supported legitimate reason for terminating [plaintiff], temporal proximity does not amount to more than a scintilla of evidence of [discrimination]'"].)

In *Arteaga,* the employer discharged an employee one week after learning of the employee's alleged disability. In rejecting the employee's argument that "the timing, by itself, raises a dispute as to the company's true motivation," the court held that "temporal proximity" may satisfy the "causation requirement at the first step of the burden-shifting process . . . . [¶] [b]ut temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination." (*Arteaga, supra,* 163 Cal.App.4th at p. 353, italics omitted.) The court in *Arteaga* gave an example when temporal proximity can be relevant to effectively establish discriminatory intent. The court described, "the classic situation where temporal proximity is a factor, an employee has worked for the same employer for several years, has a good or excellent performance record, and then, after engaging in some type of protected activity—

---

[13] As Equinox points out, Sykes's reliance on Espinoza's "admission" that "she had not decided to terminate Sykes" on May 21, 2013, is unpersuasive because Espinoza testified "[i]t was not [her] decision" to terminate Sykes.

38

disclosing a disability—is suddenly accused of serious performance problems, subjected to derogatory comments about the protected activity, and terminated." (*Id*. at pp. 353-354.) The court held in "those circumstances, temporal proximity, *together* with the *other* evidence, may be sufficient to establish pretext." (*Ibid*.)

Here, Equinox had well-documented, legitimate reasons supporting Sykes's termination. The write-ups existed before Sykes's May 23, 2013 meeting with Strachan and Figueroa, as did Avitia's communication expressing her desire to terminate Sykes. Thus, timing alone cannot establish pretext because Equinox has put forward strong, legitimate, and nondiscriminatory reasons for Sykes's discharge. Further, there is no "other evidence" to show a discriminatory intent. Sykes was a short-term employee of several months with a negative performance record. Sykes failed to offer any positive performance reviews.[14] Sykes failed to show that the decision-makers (Avitia, Figueroa, and Strachan) harbored any discriminatory bias, and Hands was not involved in the decision to discharge Sykes or in the two write-ups. Without any evidence of a discriminatory intent, temporal proximity, even if considered, is insufficient to establish a triable issue of fact. (See *Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1112

---

[14]  Sykes's argument that "Equinox admits that it did not review all of Sykes's front desk evaluations–even though they capture his performance–before making the decision to terminate Sykes because they were all 'deleted from the system,'" is not supported by a record cite, and the argument is therefore forfeited. (See *Centex Homes, supra,* 19 Cal.App.5th at pp. 796-797.)

39

["temporal proximity, although sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual"].)

> D. *Sykes Failed To Raise a Triable Issue as to His Retaliation and Wrongful Termination Causes of Action*

When a plaintiff alleges a retaliatory employment termination either as a claim under the FEHA or the Labor Code, and the defendant seeks summary judgment, California follows the *McDonnell Douglas* burden-shifting analysis. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1130 (*Yanowitz*) [FEHA]; *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453 [FEHA and Labor Code].) Under the *McDonnell Douglas* framework, to establish a prima facie case of retaliation, an employee "must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ""drops out of the picture,"" and the burden shifts back to the employee to prove intentional retaliation." (*Yanowitz,* at p. 1042.)

Sykes argues that the trial court erred in granting summary adjudication on his causes of action for retaliation

under FEHA and the Labor Code because he engaged in "protected activity" at the May 23, 2013 meeting, and "Equinox did not intend to terminate Sykes before May 23, 2013." Therefore, based on the same temporal proximity argument he made in support of his discrimination claim, Sykes contends he raised a triable issue regarding the causal relationship between his complaints at the May 23, 2013 meeting and his termination several days later. As discussed, Sykes's temporal proximity argument is not supported by the record. Thus, the trial court properly granted summary adjudication on Sykes's retaliation claims finding there was "no causal link" between the two events because, before the May 23, 2013 meeting, "Avitia had already requested that [Sykes] be terminated."[15]

Even if Sykes had established a prima facie case of retaliation under the *McDonnell Douglas* framework, as shown, Equinox demonstrated legitimate reasons, unrelated to any

---

[15] Sykes also did not engage in any "protected activity" concerning his "refus[al] to alter other employee's time cards." Sykes testified that Farino refused to approve Sykes's recommended corrections to the payroll records, and on "one occasion," Sykes made the corrections in the payroll system without Farino's approval. Sykes, as to this "one occasion," further testified that he tried his best to input "what hours [the trainers] actually worked." The absence of Farino's approval did not make Sykes's conduct unlawful because he was honestly entering the information and he has not identified any legal requirement that a supervisor was required to approve his work. (See *Ross v. County of Riverside* (2019) 36 Cal.App.5th 580, 592 ["'[t]o have a reasonably based suspicion of illegal activity, the employee must be able to point to some legal foundation for his suspicion—some statute, rule or regulation which may have been violated by the conduct he disclosed'"].)

41

improper intent, supporting Sykes's discharge. Accordingly, any presumption of retaliation """"drops out of the picture,"" and the burden shifts back to [Sykes] to prove intentional retaliation." (*Yanowitz, supra,* 36 Cal.4th at p. 1042.)

Sykes has not identified any evidence from which the trier of fact could draw a reasonable inference of retaliation. Sykes has not connected Avitia, Figueroa, or Strachan to any bias or prejudice against him. Sykes's argument that "immediately" after he complained about Hands hugging him, he received the second write-up on May 21, 2013, lacks a record citation. He therefore forfeited this argument. (See *Centex Homes, supra,* 19 Cal.App.5th at pp. 796-797.) As stated, Hands was not involved in the decision to terminate Sykes and did not participate in Sykes's two write-ups. Sykes's repetition of the argument that, "Equinox's reasons for termination are pretext," does not establish an improper intent.[16]

---

[16] Sykes cites the declaration of Denise Sillman, a former Equinox employee, arguing she "corroborated Sykes' claims as well." However, the trial court sustained 39 evidentiary objections to the Sillman declaration, including the portions on which Sykes relies. Further, Sykes relies on "Figueroa's handwritten notes." The trial court also sustained Equinox's evidentiary objections to the notes, which Sykes has likewise not challenged. Under these circumstances, Sykes forfeited the arguments based on these excluded matters. (*Aptos Council, supra,* 10 Cal.App.5th at p. 296, fn. 7; *Altavion, supra,* 226 Cal.App.4th at p. 63.)

42

Further, even assuming Sykes's evidence established some temporal proximity between his alleged protected complaints and his termination sufficient to establish a prima facie case, that alone does not preclude summary judgment.  (See *Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 94 ["a mere temporal relationship between an employee's protected activity and the adverse employment action, while sufficient for the plaintiff's prima face case, cannot [alone] create a triable issue of fact if the employer offers a legitimate, nonretaliatory reason for the adverse action"]; *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 388 [same].)

The trial court correctly granted summary adjudication on Sykes's retaliation claims.[17]

> ### E.    *Sykes Raised Triable Issues as to His Sexual Harassment Cause of Action*

FEHA prohibits an employer from harassing an employee on the basis of "sex" or "sexual orientation."  (Gov. Code, § 12940, subd. (j)(1).)  FEHA's "prohibition against sexual harassment includes protection from a broad range of conduct, ranging from expressly or impliedly conditioning employment benefits on

---

[17]    Sykes argues in a caption in his opening brief that he "established" his cause of action for wrongful termination. However, Sykes fails to present any argument or citation to legal authority in support of the cause of action.  He thus forfeited any challenge to the trial court's ruling.  (*Cahill, supra,* 194 Cal.App.4th at p. 956.)  In any event, the trial court correctly ruled that Sykes "has been unable to demonstrate a causal link between his purported protected activity and the decision by Figueroa and Strachan to terminate him."

43

submission to or tolerance of unwelcome sexual advances, to the creation of a work environment that is hostile or abusive on the basis of sex." (*Miller, supra,* 36 Cal.4th at p. 461.)  At the time of Sykes' employment,[18] a hostile work environment sexual harassment claim required a plaintiff employee to show:  (1) he or she was subjected to unwelcome sexual advances, conduct, or comments; (2) the harassment was based on sex; and (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.  (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 279 (*Lyle*).)

> To prevail on a claim that the harassment was severe or pervasive as to create a hostile work environment, an employee "must demonstrate that the conduct complained of was *severe enough or sufficiently pervasive* to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees *because of their sex*. [Citations.] . . . [A] workplace may give rise to liability when it 'is permeated with "discriminatory [sex-based] intimidation, ridicule, and insult," [citation], that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]"'" (*Lyle, supra,* 38 Cal.4th at p. 279.)  "'Whether the conduct of the alleged harassers was sufficiently severe or pervasive to create a hostile or abusive working environment depends on the totality of the

---

[18]    Effective January 1, 2019, the Legislature amended the Government Code to add section 12923, which in part altered the standard for unlawful harassment under FEHA.  (See Gov. Code, § 12923.)  Sykes does not argue that the amendments apply to his cause of action.

circumstances. "'These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"'" (*Serri, supra,* 226 Cal.App.4th at p. 870.) "Since 'there is no possible justification for harassment in the workplace,' an employer cannot offer a legitimate nondiscriminatory reason for it." (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 927.)

"Harassment includes but is not limited to . . . [v]erbal harassment, e.g., epithets, derogatory comments or slurs on a basis enumerated in the Act . . . ." (Cal. Code Regs., tit. 2, § 11019, subd. (b)(2)(A); see *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 129.) "'[H]arassing conduct takes place "outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives." [Citation.] "Thus, harassment focuses on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee.'"'" (*Serri, supra,* 226 Cal.App.4th at p. 869; see *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706.)

Incidents of harassing conduct over a short period of time may constitute severe or pervasive harassment, especially when committed by a supervisor. (*Caldera v. Department of Corrections & Rehabilitation* (2018) 25 Cal.App.5th 31, 39 (*Caldera*); see *Fuentes v. AutoZone, Inc.* (2011) 200 Cal.App.4th 1221, 1224, 1234, 1237 (*Fuentes*) [supervisors' harassment over a three-week period sufficient to support jury verdict in favor of

plaintiff]; *Dee*, *supra*, 106 Cal.App.4th at p. 36 ["a single offensive act by a coemployee is not enough to establish employer liability for a hostile work environment," but "where that act is committed by a supervisor, the result may be different"].) "Under both Title VII and FEHA, sexual harassment can occur between members of the same gender as long as the plaintiff can establish the harassment amounted to discrimination *because of sex*." (*Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, 1525.) An employer is strictly liable for harassment by a supervisor, such as Hands. Gov. Code, 12940, subd. (j)(i); see *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1041 ["FEHA makes the employer strictly liable for harassment by a supervisor"].) There is no dispute that Hands was Sykes's supervisor under section 12940, subdivision (j)(i).

The trial court found that the incidents on which Sykes premised his sexual harassment claim were not sufficiently severe or pervasive to alter the conditions of Sykes's employment and create an abusive working environment. Although we consider it a close call, we disagree. Liberally construing the evidence in Sykes's favor, as we must, we conclude that Sykes satisfied his burden to demonstrate triable issues of material fact exist regarding his cause of action for sexual harassment.

Sykes worked at Equinox for a relatively short time; January 2013 to May 2013. Sykes testified that the majority of the harassment began in March 2013. During this time frame, Hands, Sykes's direct supervisor and a gay male, occupied a position of authority over Sykes. Although Sykes chose to keep private that he was bisexual, Hands asked Sykes if he was gay. Sykes did not respond. Knowing Sykes's sexual orientation was an unwelcome subject matter, Hands persisted by asking on

46

several occasions if Sykes had "fucked" certain male club members and, on other occasions, whether he wanted to "fuck" male club members. Hands also asked Sykes whether he frequented gay bars. Hands also told Sykes to stop flirting with male club members, even though there was no evidence that Sykes was doing so. Sykes did not respond to any of Hands's comments. Sykes testified that he was "very uncomfortable" around Hands.

Hands routinely addressed Sykes by using the terms "sir," "mister," "cutie," and "rock star." Through these greetings, according to Sykes, Hands conveyed sexual innuendo. Sykes believed Hands was flirting with him. Hands also told Sykes that he had a "second job [that] was something related to the [pornographic] industry." Sykes believed Hands's comment about his second job was harassment because "it was sexual in nature." Sykes also testified an employee asked Sykes "which half is [your] black half." Sykes interpreted this question as referring to his penis. Hands then commented, "[W]e'll have to catch him in the locker room next time." Hands also made comments to Sykes about Hands's female supervisors' breast implants.[19]

Sykes testified that Hands's harassment included unwanted physical contact. For example, on a number of occasions, after giving Sykes a "high five," Hands hugged him. On separate occasions, Hands also patted Sykes on the head and on the behind. Sykes complained about Hands's conduct to Hands's supervisors, but Hands's harassment continued.

---

[19]     Farino, the personal trainer manager, attempted to show Sykes a gay pornographic video involving an Equinox trainer.

Given the brief time frame of Sykes's employment at Equinox, the incidents of harassment were not, at least as a matter of law, occasional and isolated. The frequency and regularity of the alleged conduct supports an inference Hands engaged in a pervasive pattern of conduct, rather than a few isolated acts. (*Caldera, supra,* 25 Cal.App.5th at p. 39 ["[i]ncidents of harassing conduct over a short period of time may constitute severe or pervasive harassment"]; *Fuentes, supra,* 200 Cal.App.4th at p. 1234 [while the alleged incidents "occurred over a compressed period of time, approximately three weeks . . . , we find substantial evidence that the harassment suffered by [the plaintiff] was both pervasive and severe"].) Whether Hands's alleged conduct interfered with Sykes's work performance is a relevant factor in determining whether a hostile work environment existed, but no single factor is required. (*Miller, supra,* 36 Cal.4th at p. 462.) Based on the totality of the circumstances, a reasonable jury could conclude that Hands engaged in a pervasive pattern of harassing conduct. (See *Lyle, supra,* 38 Cal.4th at p. 283 ["the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature"].)

Equinox argues that "there is no evidence that [Sykes's supervisor's] conduct or comments were directed at Sykes *because of* his sex or sexual orientation (the latter of which Sykes admitted no one at Equinox knew)." However, a reasonable jury could infer that Hands directed his comments and physical touching at Sykes because of Sykes's sexual orientation. For example, Hands asked Sykes whether he "fucked" male club members and whether he frequented gay bars. Without any basis, Hands also asked Sykes to stop flirting with male club

48

members.  Although Sykes refused to reveal his sexual orientation, based on the nature of Hands's comments, it is reasonable to infer that Hands directed his attention to Sykes because Hands believed that Sykes was gay.  Therefore, a reasonable jury could find Hands's conduct constituted harassment because of Sykes's sexual orientation.  (Cf. *Lyle, supra,* 38 Cal.4th at p. 280 ["it is the disparate treatment of an employee on the basis of sex–not the mere discussion of sex or use of vulgar language–that is the essence of a sexual harassment claim"].)

Sykes raised a triable issue whether Hands's conduct was sufficiently severe or pervasive to alter the conditions of Sykes's employment and create an abusive working environment based on sex.  (See generally *Sharufa v. Festival Fun Parks, LLC* (2020) 49 Cal.App.5th 493, 497 [to determine whether a defendant is entitled to summary judgment, "we review the entire record and ask whether a reasonable trier of fact could find in plaintiff's favor"]; *Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1474 ["if any evidence or inference therefrom shows or implies the existence of the required element(s) of a cause of action, the court must deny a defendant's motion for summary judgment . . . because a reasonable trier of fact could find for the plaintiff"].)

F. *Triable Issues of Fact Exist Regarding Sykes's Cause of Action for Failure To Prevent Harassment*

Government Code section 12940, subdivision (k), provides it is an unlawful employment practice for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."  To prove a claim for failure to prevent harassment, a plaintiff must show (1) plaintiff was

49

subjected to harassment; (2) the defendant failed to take all reasonable steps to prevent harassment; and (3) the failure caused plaintiff to suffer injury, damage, loss, or harm.  (*Caldera, supra,* 25 Cal.App.5th at pp. 43-44.)

Sykes contends he complained about Hands's harassment, but Equinox failed to take steps to prevent Hands's harassing conduct.  Equinox argues Sykes's cause of action fails because it was derivative of his other causes of action that lacked merit.  Equinox is correct that a cause of action for failure to prevent harassment is derivative of a cause of action for the underlying violation.  (See *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925, fn. 4; *Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 597; *Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1166.)

Therefore, to the extent that Sykes's cause of action is based on his discrimination or retaliation causes of action, it also fails.  However, because there are triable issues of fact as to Sykes's cause of action for sexual harassment, his claim for failure to prevent sexual harassment likewise survives summary adjudication.  (See *Caldera, supra,* 25 Cal.App.5th at p. 44 [upholding jury verdict because defendants' conduct was severe or pervasive and employer failed to take all reasonable steps to prevent harassment].)

G.    *Sykes Failed To Raise a Triable Issue on His Claim for Punitive Damages*

In granting summary adjudication against Sykes on his claim for punitive damages, the trial court found that Sykes failed to present "sufficient evidence of fraudulent, oppressive or malicious conduct to support a claim for punitive damages."  The

50

trial court also ruled that Sykes's punitive damage claim failed because, after Equinox presented evidence that Avitia, Espinoza, Figueroa, Hands, and Strachan were not Equinox's officers, directors, or managing agents, Sykes failed to present any contrary evidence.

Civil Code section 3294, subdivision (a), provides a plaintiff may recover punitive damages where a defendant has been guilty of "oppression, fraud, or malice." Section 3294, subdivision (c)(1), defines "malice" as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights . . . of others." Equinox carried its initial burden on summary judgment to show that one or more elements of Sykes's punitive damage claim could not be established. (§ 437c, subd. (p)(2); see *Aguilar, supra,* 25 Cal.4th at p. 854.)

Sykes's argument that "bad faith, and even malice, may be inferred from a failure to investigate a discrimination complaint," is insufficient to carry his burden to create a triable issue of material fact. Sykes failed to "set forth the specific facts showing that a triable issue of material fact exist[ed]" regarding his claim for punitive damages. (§ 437c, subd. (p)(2); see *Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1176 [summary adjudication granted on punitive damage claim, "'"Where there is no evidence that gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice, the trial court need not, and indeed should not, submit the issue of punitive damages to the jury"'"].)

Further, an employer is not liable for punitive damages unless it had "advance knowledge" of the employee's unfitness and employed him with a "conscious disregard" of the rights of

others, or "authorized or ratified" the conduct for which the damages are awarded. (Civ. Code, § 3294, subd. (b).) "[T]he advance knowledge and conscious disregard . . . or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." (*Ibid*.)

In their declarations submitted in support of the motion for summary judgment, Avitia, Hands, Espinoza, Figueroa, and Strachan testified they were not officers, directors, or managing agents of Equinox. Equinox thus met its initial burden under section 437c, subdivision (p)(2). Sykes, however, did not present evidence to create triable issues about these facts. (§ 437c, subd. (p)(2).) Sykes's argument that Figueroa and Strachan were "surely managing agents" because they were Equinox's "Human Resources director" and "Regional Director" is devoid of facts. Accordingly, for this additional reason, Equinox was entitled to summary adjudication on Sykes's punitive damage claim. (See *CRST, Inc. v. Superior Court* (2017) 11 Cal.App.5th 1255, 1274 [summary adjudication granted on punitive damage claim because "nothing in this evidence suggests that [corporate supervisor] had discretionary authority sufficiently substantial to influence CRST's corporate policies"].)

**DISPOSITION**

The trial court's order granting summary judgment and the judgment entered against Sykes are reversed.  The trial court's separate order granting summary adjudication is affirmed as to Sykes's causes of action for discrimination based on sexual orientation, retaliation, and wrongful termination and his claim for punitive damages and reversed as to Sykes's causes of action for sexual harassment and failure to prevent sexual harassment. The trial court's orders denying Sykes's ex parte applications are affirmed.  The parties are to bear their costs on appeal.


DILLON, J.[*]


We concur:


PERLUSS, P. J.


SEGAL, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.